605 So.2d 1032 (1991)
Bobby Ray ROBERTS, Jr.
v.
Joseph T. BENOIT, the City of New Orleans, Parish of Orleans, Criminal Sheriff for the Parish of Orleans, State of Louisiana, Charles Foti, Individually, and XYZ Insurance Companies.
No. 91-C-0394.
Supreme Court of Louisiana.
September 9, 1991.
Dissenting Opinion September 9, 1991.
As Revised September 10, 1991.
Dissenting Opinion September 9, 1991.
As Revised September 10, 1991.
Dissenting Opinion September 11, 1991.
Rehearing Granted November 1, 1991.
On Rehearing May 28, 1992.
*1033 Thomas A. Usry, Lloyd F. Schroeder, II, Usry and Weeks, Metairie, for defendant-applicant.
Jacob J. Amato, Jr., Lisa A. Dunn, Amato & Creely, Gretna, Robert A. Dragon, Jr., Dragon & Kellner, Lafayette, Ronald A.
*1034 Welcker, Vincent J. Glorioso, Jr., Glorioso & Welcker, New Orleans, David Wyatt Robertson, Baton Rouge, for respondents.
Robert A. Dragon, Jr., Dragon & Kellner, Lafayette, Ronald A. Welcker, Glorioso & Welcker, Frank J. D'Amico, Vincent J. Glorioso, Jr., New Orleans, David Wyatt Robertson, Baton Rouge, Stephen Guy deLaup, Metairie, Jacob John Amato, Jr., Lisa Anne Dunn, Amato & Creely, Gretna, for plaintiffs-respondents.
T. Allen Usry, Lloyd F. Schroeder, II, Usry & Weeks, Metairie, for defendantsrespondents.
Brett John Prendergast, New Orleans, for New Orleans City Attorney's Office, amicus curiae.
William R. Coenen, Jr., Rayville, for Sheriff Gary K. Bennett, West Carroll Parish, Sheriff Lovell Graham, Richland Parish, Sheriff Eugene Parker, Franklin Parish, Louisiana Dist. Atty's Ass'n, amicus curiae.
Homer E. Barousse, Jr., Edwards, Stefanski, Barousse, Cunningham, Stefanski & Zaunbrecher, Crowley, for Sheriff Kenneth Goss, Acadia Parish, amicus curiae.
Scott Gerard Vincent, Cleveland, Barrios, Kingsdorf & Casteix, New Orleans, for Sheriff Ed Layrisson, Tangipahoa Parish, amicus curiae.
John Robert Burgess, Burgess & Lee, Livingston, for Sheriff Odom Graves, Livingston Parish, amicus curiae.
Edwin L Blewer, Jr., Kelly W. Strickland, James Richard Sterritt, Cook, Yancey, King & Galloway, Shreveport, for Sheriff Don Hathaway, Caddo Parish, Sheriff Larry Deen, Bossier Parish, Sheriff J.R. Oakes, Claiborne Parish, Sheriff Floyd Lambert, DeSoto Parish, Sheriff Buddy Huckabay, Red River Parish, Sheriff Royce McMahen, Webster Parish, Sheriff Joe Storey, Bienville Parish, amicus curiae.
Stephen Anees Mogabgab, Hulse, Nelson & Wanek, Covington, for Sheriff Pat Canulette, St. Tammany Parish, amicus curiae.
Tucker Lee Melancon, Melancon & Rabalais, Marksville, for Sheriff William Belt, Avoyelles Parish, amicus curiae.
Stephen J. Oats, William Martin Hudson, III, Patrick B. McIntire, Oats & Hudson, Lafayette, for Sheriff James R. Savoie, Cameron Parish, Sheriff Wayne Morein, Evangeline Parish, Sheriff Wiley Warren, Winn Parish, amicus curiae.
Richard Phillip Ieyoub, Atty. Gen., Thomas S. Halligan, Asst. Atty. Gen., Counsel for Hon. Richard P. Ieyoub, Atty Gen., and the State of La., amicus curiae.
Bradley Charles Myers, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, for Louisiana Mun. Ass'n, amicus curiae.
Thomas Allen Usry, Lloyd F. Schroeder, II, Usry & Weeks, Metairie, for Louisiana Sheriff's Ass'n, Sheriff Thomas Mabile, Assumption Parish, Sheriff Floyd Hodges, Caldwell Parish, Sheriff Randy Maxwell, Concordia Parish, Sheriff Dale Rinicker, East Carroll Parish, Sheriff Freddie Pitre, Sr., Iberville Parish, Sheriff Van Beasley, Jackson Parish, Sheriff Wayne McGuffee, LaSalle Parish, Sheriff Willie W. Houck, Lincoln Parish, Sheriff Charles Harmon, Madison Parish, Sheriff Frank Carroll, Morehouse Parish, Sheriff Laymon Godwin, Ouachita Parish, Sheriff Tommy Hollingsworth, Rapides Parish, Sheriff Eugene Holland, St. Helena Parish, Sheriff Joseph Nassar, St. James Parish, Sheriff Lloyd B. Johnson, St. John the Baptist Parish, Sheriff Huey Bourgeois, St. Mary Parish, Sheriff Fred E. Scott, Tensas Parish, Sheriff Belvin F. Bergeron, West Baton Rouge Parish, Sheriff William Daniel, West Feliciana Parish, amicus curiae.
Steven Franklin Griffith, Destrehan, for Sheriff Johnny Marino, St. Charles Parish, amicus curiae.
Fred A. Book, Jr., Michael Steven Beverung, Lake Charles, for Sheriff Wayne McElveen, Calcasieu Parish, amicus curiae.
Daniel Rault Martiny, Metairie, for Sheriff Harry Lee, Jefferson Parish, Sheriff Ernest D. Wooton, Plaquemine Parish, amicus curiae.
Clark Raymond Cosse, III, Baton Rouge, for Louisiana Ass'n Bus. & Ind. amicus curiae.
Dissenting Opinion of Chief Justice Calogero September 9, 1991.
Dissenting Opinion of Justice Watson September 9, 1991.
Dissenting Opinion of Justice Dennis September 11, 1991.
HALL, Justice.
This is a suit for damages sustained by plaintiff, Bobby Ray Roberts, Jr., as a result *1035 of the accidental discharge of a gun owned and possessed by Joseph T. Benoit, a commissioned deputy sheriff with the Orleans Parish Criminal Sheriff's Office. Plaintiff sued Benoit, the State of Louisiana, the City of New Orleans, the Parish of Orleans, the Criminal Sheriff for the Parish of Orleans, Sheriff Charles Foti, Jr., individually, and Southern American Insurance Company, the insurer for the Criminal Sheriff's Office.[1] Plaintiff's wife, Kathy Roberts, intervened in this suit on behalf of herself and plaintiff's three minor children. The trial court found that plaintiff established the negligence of Benoit and Sheriff Foti, and awarded damages in the amount of $785,000 to plaintiff, $25,000 to plaintiff's wife, and $10,000 to each of plaintiff's three minor children. The court of appeal, finding that plaintiff established Sheriff Foti's negligence in hiring, commissioning and failing to adequately train Benoit, affirmed the trial court's judgment, with one judge dissenting in part.[2]Roberts v. Benoit, 574 So.2d 1256 (La.App. 4th Cir.1991). Having granted Sheriff Foti's writ application, 575 So.2d 816 (La.1991), we now reverse in part and render judgment rejecting the demands against the sheriff.[3]

FACTS
In March 1979, Sheriff Foti hired the defendant Benoit as a cook. In January 1981, Sheriff Foti commissioned the kitchen workers, including Benoit, as deputy sheriffs, enabling them to receive state supplemental pay. Before being commissioned, the kitchen workers completed a training course. Training was given on an intermittent basis over a six-week period and included only one day (eight hours) of firearm training.
During the training course, the trainees were instructed that while off duty, it was better to have a gun and not need it than to need a gun and not have it, thereby impliedly encouraging deputies to carry a gun while off duty. The trainees were also given a copy of department regulations stating that when engaged in recreational activities which include the consumption of alcohol, a deputy should in all cases remove his firearm to a safe place, or leave it at home, before commencing with such activities. The regulations also stated that a weapon should be drawn only when one's life is in danger, or the use of deadly force is anticipated.
On October 25, 1981, the day of the accident, Benoit completed his regular kitchen duties at 2:30 p.m. After work, Benoit went home, bathed, changed clothes and went to his mother-in-law's home. Benoit then went to the home of his brother-inlaw, Merlin Fontenette. While at Fontenette's home, Benoit drank a beer. Benoit and Fontenette then went to plaintiff's home to have plaintiff repair a broken light in Benoit's car. When they arrived at plaintiff's home, plaintiff was installing a stereo in another vehicle, and Benoit was drinking another beer. While there, Benoit drank a glass of wine and, by this time, was staggering a little.[4]
Benoit had in his possession two weapons: a M1 carbine rifle which was in the trunk of his car, and a .38 caliber Charter Arms revolver purchased by him after he was commissioned as a deputy which was in an ankle holster on his leg. While at plaintiff's home, Benoit removed the revolver from the holster and played with the revolver for a period of almost forty-five minutes before the accident occurred. During this period, Benoit handed the revolver *1036 to Fontenette, who handed it back to Benoit; and, at one point, when the bullets fell from the revolver, plaintiff picked them off of the floor and handed them back to Benoit. Benoit cocked and uncocked the gun. During this period, plaintiff asked Benoit to put the gun away several times. Thereafter, the revolver discharged severely injuring plaintiff.

PARTIES' CONTENTIONS
No one contests the trial court's finding of defendant Benoit's negligence. Rather, the sole issue before this court is whether the sheriff in his official capacity should be held legally responsible for plaintiff's injuries.[5] Plaintiff asserts two bases for holding Sheriff Foti liable: (1) direct liability for negligently hiring, commissioning and training Benoit; and (2) vicarious liability for his employee's tortious conduct. Defendant, on the other hand, contends that Sheriff Foti's allegedly deficient practices in hiring, commissioning and training Benoit were neither a cause in fact nor a legal cause of plaintiff's injuries. Defendant further contends that no duty existed requiring Sheriff Foti to protect plaintiff against the risk of being shot by Benoit. Defendant still further contends that the sole cause of the accident was Benoit's negligence in engaging in horseplay with a loaded gun while intoxicated, an action in violation of Sheriff Foti's written regulations. Finally, defendant contends that to find Sheriff Foti legally responsible in this case would be, in essence, to impose absolute liability.
Agreeing with plaintiff, the trial court found Sheriff Foti primarily liable for negligently hiring, commissioning and training Benoit. Affirming, the court of appeal reasoned:
We find that the evidence supports the trial court's determination that Sheriff Foti did indeed breach his duty to ensure that Deputy Benoit, as a commissioned deputy sheriff, was adequately trained in the use of firearms. The failure to adequately train Deputy Benoit clearly was a cause in fact of plaintiff's injuries. But for his commission as a deputy sheriff, defendant Benoit would not have been carrying the weapon which caused plaintiff's injuries.
Roberts, 574 So.2d at 1263.
The dissenting judge, however, would have affirmed on the basis of vicarious liability. Relying on our holding in Ermert v. Hartford Insurance Co., 559 So.2d 467, 476 (La.1990), the dissent would have found that Benoit was acting within the scope of his employment by carrying a gun pursuant to his commission as a deputy. Particularly, the dissent observed that "the purpose of serving the sheriff's business `actuated' Benoit's decision to carry the gun to an appreciable extent." Roberts, 574 So.2d at 1266.

LAW
At the outset, we identify two potential codal bases for imposing legal responsibility on Sheriff Foti: (1) primary liability under Civil Code Article 2315 and (2) vicarious liability under Civil Code Article 2320. In applying these general codal provisions to concrete master-servant problems, we have recognized the appropriateness of drawing freely from the common law jurisprudence. Ermert, supra. As the precise questions posed by the master-servant problem presented in the instant case have not previously been considered by the courts of this state, we begin by discussing the jurisprudence of other jurisdictions that have considered similar claims.

SIMILAR TORTS IN OTHER STATES
Under the common law jurisprudence, a third party injured by an off-duty deputy's negligent handling of a firearm has been recognized as having two potential theories for holding the deputy's municipal employer liable: (1) the common law doctrine of respondeat superior and (2) the tort of negligent *1037 hiring.[6] The former is based on the deputy's negligence, which is imputed to the municipal employer; the latter is based upon the employer's independent negligence in hiring, commissioning, training and/or retaining the deputy. These two theories of liability are separate and independent. Peer v. City of Newark, 71 N.J.Super. 12, 176 A.2d 249 (1961). The major difference between them is that the tort of negligent hiring is not cabined to the narrow confines imposed by the respondeat superior's "scope of employment" limitation. Peer, supra. A similar limitation, however, is imposed on the negligent hiring cause of action. This limitation is that the deputy in some respect be engaged in furthering the employer's businesslaw enforcementwhen he "stepped beyond the line of duty." Nishan v. Godsey, 166 F.Supp. 6 (E.D.Tenn.1958); Strachan v. Kitsap County, 27 Wash.App. 271, 616 P.2d 1251, review denied, 94 Wash.2d 1025 (1980). Thus, the considerations relied upon by courts in imposing liability under the two doctrines are similar.
First, under the respondeat superior doctrine, a municipal employer has been held vicariously liable for the tortious acts of its deputy when the deputy, albeit technically "off duty," is acting within the scope of his employment. 18 E. McQuillan, The Law of Municipal Corporations, § 58.80 b (3d Rev.Ed.1977) (hereinafter "McQuillan"). In finding an off-duty deputy within the scope of his employment, courts have required only that the deputy be actively engaged in "police work" or performing some action furthering his police function. Collins v. City of New York, 11 Misc.2d 76, 171 N.Y.S.2d 710 (Sup.Ct. 1958), aff'd, 8 A.D.2d 613, 185 N.Y.S.2d 740, and 7 N.Y.2d 822, 196 N.Y.S.2d 700, 164 N.E.2d 719 (1959). Emphasizing the peculiar nature of a policeman's employment, courts have found factors such as the time and place of the deputy's actions immaterial.
Because of the peculiar nature of the policeman's employment, the municipal employer has been held liable for injuries inflicted as a result of the officer's negligence, even where the policeman is technically off duty, for the reason that he is required by statute or regulation to be available to perform in his employer's behalf at all times, or because he is executing a function, e.g., cleaning a weapon, in furtherance of his employer's interest. The time and place of such cleaning would generally be considered immaterial.
Greenstone, Liability of Police Officers for Misuse of Their Weapons, 16 Clev.-Mar.L.Rev. 397, 408 (1967).
Relying on the requirement that the deputy be armed at all times, the court in Collins, supra, found an off-duty deputy that stumbled on a subway station platform, dropping the paper bag in which he was carrying his service revolver, as within the scope of his employment. In finding the municipal employer liable, the court reasoned that, "the defendant policeman though technically within the off duty classification was engaged in the execution of a function specifically prescribed by the defendant employer the City of New York and the careless or negligent performance of such dutycarrying a gunnonetheless constituted performance of a requirement of his employment and in furtherance of his employer's interest." 171 N.Y.S.2d at 713 (emphasis added); Peer, supra; Kull v. City of New York, 32 N.Y.2d 951, 347 N.Y.S.2d 205, 300 N.E.2d 736 (1973); District of Columbia v. Davis, 386 A.2d 1195, 1205 (D.C.App.1978); Garner v. Saunders, 281 So.2d 392 (Fla.App. 2 Dist.1973).
The rationale for relying on the presence of a requirement that the deputy be armed at all times in imposing liability is that the public fisc should bear the loss associated with placing a dangerous instrumentality in an officer's hands on a round-the-clock basis: "The regulations requiring officers carry their guns at all times is for the *1038 benefit of the public; therefore, it is reasonable that the public, through the municipality, bear the monetary risk of negligent injury to innocent persons resulting from that requirement." District of Columbia, 386 A.2d at 1205. Stated differently, "[w]here a municipal corporation requires its policemen to carry firearms at all times, it should be liable, just as a private employer, for not controlling its employees who are required by the employer to carry these highly dangerous instrumentalities." Garner, 281 So.2d at 393.
Conversely, absent such a requirement, the courts have been unwilling to extend liability to municipal employers. Fitzgerald v. McCutcheon, 270 Pa.Super. 102, 410 A.2d 1270 (1979); Conroy v. City of Ballwin, 723 S.W.2d 476 (Mo.App.1986); Nishan v. Godsey, 166 F.Supp. 6 (E.D.Tenn. 1958).
Significantly, an attempt to equate the municipal employer's authorization of an off-duty deputy to carry a gun to such a requirement has been rejected. Fitzgerald, supra. In finding that a mere authorization, as opposed to requirement, that a deputy carry a weapon off duty insufficient to place the deputy within the scope of employment, the court in Fitzgerald held that to do so would impose too onerous of a burden on the employer:
This argument, if carried to its ultimate conclusion, would require the City to respond in damages for injuries caused by the negligent conduct of all off-duty police officers. We decline to impose such an onerous burden.
410 A.2d at 1272.
Even when a deputy is required to be armed at all times, the municipal employer will not always be held liable. See District of Columbia, supra. As the court in Collins, supra, observed:
It is important to distinguish this situation from the cases in which intoxicated or unbalanced police officers, generally after a tour of the bars, proceeded to shoot some innocent bystander. Absent proof of prior notice of such propensities on the part of the authorities, the city may not be held liable under the doctrine because the officer has then gone "outside of his employment, and without regard to his service, acting maliciously, or in order to effect some purpose of his own."
171 N.Y.S.2d at 714.
In sum, every conceivable discharge of a gun in an off-duty deputy's possession will not be found to be within the scope of employment. Id. The following cases are illustrative of the type of conduct that has been found sufficient to take off-duty deputies outside the scope of employment: Fitzgerald v. McCutcheon, 270 Pa.Super. 102, 410 A.2d 1270 (1979) (intoxicated off-duty deputy shooting neighbor during dispute over deputy's car keys); Dzing v. City of Chicago, 84 Ill.App.3d 704, 40 Ill.Dec. 420, 406 N.E.2d 121 (1 Dist.1980) (intoxicated off-duty deputy shooting his way into victim's apartment, believing he was confronting an intruder in his own apartment); Strachan v. Kitsap County, 27 Wash.App. 271, 616 P.2d 1251, review denied, 94 Wash.2d 1025 (1980) (accidental shooting by off-duty deputy engaged in horseplay with loaded gun); Nishan v. Godsey, 166 F.Supp. 6 (E.D.Tenn.1958) (reckless horseplay with loaded gun); See generally McQuillan, supra at § 58.80 b and c; Olson v. Staggs-Bilt Homes, Inc., 23 Ariz. App. 574, 534 P.2d 1073 (1975) (security guard engaged in horseplay was outside scope of employment).
We turn now to the tort of negligent hiring. Under this tort, a duty is imposed on a municipal employer in arming deputies to exercise reasonable care in hiring, training and retaining such deputies. McAndrew v. Mularchuk, 33 N.J. 172, 162 A.2d 820 (1960); Marusa v. District of Columbia, 484 F.2d 828, 831 (D.C.Cir 1973); Kull, supra; McQuillan, supra; Greenstone, Liability of Police Officers for Misuse of Their Weapons, 16 Clev.-Mar.L.Rev. 397, 410-11 (1967). The rationale impelling the recognition of a negligent hiring cause of action was clearly articulated by the New Jersey Supreme Court in McAndrew, supra:
Municipal entities must take cognizance of the hazard of sidearms. That knowledge *1039 casts an obligation on them when they arm or sanction the arming of reserve patrolmen for active police duty. The obligation is to use care commensurate with the risk to see to it that such persons are adequately trained or experienced in the proper handling and use of the weapons they are to carry. If the official in general authority in the police department sends or permits a reserve officer to go out on police duty without such training or experience, his action is one of negligent commissionof active wrongdoing, and if an injury results from an unjustified or negligent shooting by that officer in the course of performance of his duty, which is chargeable to the lack of training or experience, the municipality is liable.
162 A.2d at 827 (emphasis added); See also Steward v. Borough of Magnolia, 134 N.J.Super. 312, 340 A.2d 678, cert. denied, 68 N.J. 481, 348 A.2d 522 (1975) (finding a mandatory duty on the part of municipal employers to provide their deputies with adequate training in the use of firearms).
From the underscored language in McAndrew quoted above can be gleaned a limitation on the negligent hiring theory that the deputy, while not necessarily within the "scope of employment," be engaged in some respect in furthering the employer's business of law enforcement. See Conroy v. City of Ballwin, 723 S.W.2d 476 (Mo.App.1986); Nishan v. Godsey, 166 F.Supp. 6, 9 (E.D.Tenn.1958) (deputy was engaged in some respect in furthering the employer's businesslaw enforcement when he "stepped beyond the line of duty"); Strachan, supra (while deputy was acting outside the scope of his employmentengaged in horseplay with a loaded gundeputy's activities were arguably under the municipality's control and deputy was "performing police functions and carrying a firearm for that purpose").
Similar to the cases in which respondeat superior liability has been imposed, the courts in imposing negligent hiring liability have generally relied heavily upon the presence of a requirement that the deputy be armed at all times. Peer, supra; Marusa, supra. As with respondeat superior, the rationale for relying on the presence of such a requirement to impose negligent hiring liability is that, "[the] government has a duty to minimize the risk of injury to members of the public that is presented by [its] policy [of requiring deputies to carry service revolvers off duty]." Marusa, 484 F.2d at 831. Significantly, the court in Marusa, supra, observed that "[it was] not faced with the question of what liability the city might have for an off-duty policeman's tortious conduct, not involving the use of his service revolver." 484 F.2d at 831 n. 8.
Again, as in the respondeat superior cases discussed above, the courts have relied upon the absence of such a requirement that the deputy be armed at all times as a determinative factor for declining to impose negligent hiring liability. Nishan v. Godsey, 166 F.Supp. 6 (E.D.Tenn.1958) (citing lack of any department regulation requiring deputy to carry gun in declining to impose negligent hiring liability); Conroy v. City of Ballwin, 723 S.W.2d 476 (Mo.App.1986). In Conroy, supra, for instance, a third party was accidentally injured in the woods outside city limits by a stray bullet fired by an off-duty deputy engaged in target shooting. The deputy was using his own personal gun, one which he never used on duty. While the deputy was under a requirement that he carry a gun at all times, this requirement was inapplicable when the deputy was outside city limits. In refusing to find the municipal employer liable, the court emphasized that the accident occurred when the deputy was outside city limits and thus under no requirement to carry a weapon. The court further emphasized that the employer lacked control over its deputy's use of firearms while outside city limits, and therefore found that the employer had no duty to train its deputies in the proper use of firearms outside city limits.
The court in Conroy, supra, however, distinguished cases in which the municipal employer knew or should have known that the deputy's off-duty use of firearms created an unreasonable risk of harm to others. See also Nishan, supra (distinguishing cases such as McCrink v. City of New *1040 York, 296 N.Y. 99, 71 N.E.2d 419 (1947), in which liability was imposed upon an employer that had previous knowledge or should have known of the deputy's dangerous propensities, but nonetheless retained him on the force). The court in Conroy, however, found that for a duty to exist the employer's knowledge must be more than merely an awareness "that the [deputy] may use guns in his private civilian life without facts showing his unfitness to carry and use guns." 723 S.W.2d at 478; See e.g. Bonsignore v. City of New York, 683 F.2d 635 (2nd Cir.1982) (liability imposed upon city for failing to adopt adequate procedures for detecting mentally unfit deputies).
Thus, the courts in other jurisdictions that have addressed this issue have concluded that a municipal employer who negligently either hires, commissions, trains or retains an incompetent or unfit deputy may be liable to a third party injured as a proximate result of the employer's negligence. McQuillan, supra; Greenstone, Liability of Police Officers for Misuse of Their Weapons, 16 Clev.-Mar.L.Rev. 397, 410-11 (1967); Marusa v. District of Columbia, 484 F.2d 828, 831 (D.C.Cir.1973). Simply stated, the municipal employer is said to have a duty to exercise reasonable care in hiring, commissioning and training its deputies. This duty is not unique to sheriffs, but rather is common to all employers. Morgan v. District of Columbia, 449 A.2d 1102, 1108 n. 3 (D.C.App.1982), reh'g granted and opinion vacated, 452 A.2d 1197 (D.C.App.1982), aff'd on reh'g, 468 A.2d 1306 (D.C.App.1983); Restatement (Second) of Agency § 213 (1958).
In determining the exact risks anticipated by the imposition of the duty to use care in employing others, it has been suggested that this duty should be confined to cases in which three factors are present:
(1) the employee and the plaintiff have been in places where each had a right to be when the wrongful act occurred;
(2) the plaintiff met the employee as a direct result of the employment; and
(3) the employer would receive some benefit from the meeting had the wrongful act not occurred.
Note, The Responsibility of Employers for the Actions of Their Employees: The Negligent Hiring Theory of Liability, 53 Chi.-Kent L.Rev. 717, 730 (1977). These factors serve to balance the interests of all the partiesthe employer, employee and public. Id. Overall, the most important element is establishing a connection between the employment and the plaintiff. Id. at 721. See also Speiser, Krause and Gans, The American Law of Torts § 4:8 (1983).

LOUISIANA LAWVICARIOUS LIABILITY
In Louisiana, vicarious liability is based upon Civil Code Article 2320, which provides that an employer is liable for the tortious acts of its employees "in the exercise of the functions in which they are employed." As noted, relying on our decision in Ermert, supra, the dissent in the court of appeal suggests that Sheriff Foti should be held vicariously liable for Benoit's tortious actions. Particularly, the dissent reasons that Sheriff Foti's authorizing Benoit to carry a gun by commissioning Benoit as a deputy rendered Benoit's activitycarrying a gun off dutyin furtherance of Sheriff Foti's business of law enforcement. We disagree.
While Sheriff Foti authorized Benoit to carry a gun, it is undisputed that there was no requirementeither by statute or by regulationthat Benoit carry a gun, on or off duty. We find that to extend vicarious liability merely because the deputy was carrying a gun while off duty would be to place too onerous a burden on the sheriff and further "would be unreasonable and would exceed the legitimate legal and social purposes which sustain the doctrine." Fitzgerald, 410 A.2d at 1272.
We further find that Ermert, supra, is distinguishable factually and legally. Factually, Ermert involved an atypical masterservant relationship; the employee was an executive and a principal owner of the business. In stark contrast, this case involves a typical master-servant relationship; Sheriff *1041 Foti employed Benoit as a kitchen steward, a position we characterized in Miller v. Keating, 349 So.2d 265 (La.1977), as a relatively subordinate employee. While we recognize that Benoit was commissioned as a deputy, his employment duties remained as a kitchen worker, not as a law enforcement officer.
Legally, we reject the dissent's suggestion that in Ermert, supra, we revamped the standards for determining master-servant vicarious liability. Our decision in Ermert reiterated and further explained the standards we previously enunciated in LeBrane v. Lewis, 292 So.2d 216, 218 (La. 1974), and adapted those standards to the atypical master-servant problem that was before us. Under the LeBrane test, the determinative question is whether the employee's tortious conduct "was so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest." LeBrane, supra; See also Kogos v. Payton, 522 So.2d 1198, 1200 (La. App. 4th Cir.1988) (applying this test to find an off-duty deputy engaged in barroom brawl outside scope of employment); Schaeffer v. Duvall, 421 So.2d 262, 264-65 (La.App. 4th Cir.1982), writ denied, 427 So.2d 1209 (La.1983). Ermert explained that because vicarious liability is imposed based upon the attribution of business-related risks to the enterprise, specific conduct may be considered within the scope of employment even though it is done in part to serve the purposes of the servant. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act is otherwise within the service. In a negligence case, as distinguished from an intentional tort case, the court need only determine whether the servant's general activities at the time of the tort were within the scope of employment.
Applying the LeBrane and Ermert tests to the instant case, we find that Benoit was unquestionably acting outside the scope of his employment at the time of the tragic accident. The "time" of the accident was hours after Benoit's employment duties had ceased. The "place" of the accident was far removed from the Sheriff's kitchen. The "causation" or motive for Benoit's presence at the plaintiff's home was purely personal and unrelated to his employment duties; he was attempting to have his car repaired. Neither his general activities nor his specific activity which caused the harm, horseplaying with the gun, had any connection with the furtherance of his employer's business. Serving a function of the sheriff's office did not actuate Benoit to any appreciable extent. Benoit's activities playing with a loaded revolver while intoxicatedwere in violation of one of Sheriff Foti's written regulations. Moreover, as noted, Sheriff Foti had no regulation requiring Benoit to carry a gun while on or off duty. Accordingly, we find that Benoit was not exercising any function for which he was employed, and Sheriff Foti is therefore not vicariously liable under Civil Code Article 2320.

LOUISIANA LAWNEGLIGENCE LIABILITY
While the facts of this case present a novel issue in this state, we do not view this case as presenting a novel concept in our negligence law. Rather, we view this case as calling for the application of our standard negligence analysis. The standard negligence analysis we employ in determining whether to impose liability under Civil Code Article 2315 is the duty-risk analysis, which consists of the following four-prong inquiry:
I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a causein-fact of the harm which occurred?
II. Did the defendant owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
See Mart v. Hill, 505 So.2d 1120, 1122 (La.1987); Hill v. Lundin & Associates, *1042 Inc., 260 La. 542, 256 So.2d 620 (1972); See also McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227 (1984); Crowe, The Anatomy of a Tort-Greenian, as Interpreted by Crowe who has been Influenced by MaloneA Primer, 22 Loy.L.Rev. 903 (1976) (hereinafter "Crowe"); Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1973). For a plaintiff to recover on a negligence theory, all four inquiries must be affirmatively answered. Based on the facts of this case, we conclude that all four inquiries cannot be answered affirmatively.

CAUSE IN FACT
In the instant case, the first inquiry is whether the sheriff's conduct complained of was a cause in fact of plaintiff's injuries. The trial court answered this inquiry in the affirmative, finding that Sheriff Foti's negligence in commissioning Benoit as a deputy was a cause in fact of plaintiff's injuries. In affirming, the court of appeal found that "[t]he failure to adequately train Deputy Benoit clearly was a cause in fact of plaintiff's injuries. But for his commission as a deputy sheriff, defendant Benoit would not have been carrying the weapon which caused plaintiff's injuries." 574 So.2d at 1263. The court of appeal also found that Sheriff Foti was negligent in hiring Benoit in the first place.
In reviewing these factual findings, we are mindful of the Louisiana tradition of giving great deference to the findings of the trier of fact, jury or judge. Lirette v. State Farm Insurance Co., 563 So.2d 850, 852-53 (La.1990); Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106, 1111-12 (La.1990); Rosell v. ESCO, 549 So.2d 840 (La.1989); Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1370 (La.1984); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We, nonetheless, must determine whether the plaintiff has met his burden of establishing a factual, causal relationship between the defendant's actions and his injuries, i.e., a cause in fact.
Cause in fact is generally a "but for" inquiry; if the plaintiff probably would have not sustained the injuries but for the defendant's substandard conduct, such conduct is a cause in fact. Fowler v. Roberts, 556 So.2d 1, 5 (La.1989); Malone, Ruminations on Dixie Drive It Yourself Versus American Beverage Company, 30 La.L.Rev. 363, 370 (1970). Stated differently, the inquiry is "[d]id the defendant contribute to the plaintiff's harm or is the defendant a cause of the plaintiff's harm?" Crowe, supra at 920.
An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the "substantial factor" test. Fowler, supra. Under this test, cause in fact is found to exist when the defendant's conduct was a "substantial factor" in bringing about plaintiff's harm. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962). Under either method, it is irrelevant in determining cause in fact whether the defendant's actions were "lawful, unlawful, intentional, unintentional, negligent or non-negligent." Green, The Causal Relation Issue in Negligence Law, 60 Mich.L.Rev. 543, 549 (1962). Rather, the cause in fact inquiry is a neutral one, free of the entanglements of policy considerationsmorality, culpability or responsibilityinvolved in the duty-risk analysis. Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406, 409 (La.1976).
We recognized the very limited scope of the cause in fact inquiry in Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). There, we held that to the extent the defendant's actions had something to do with the injury the plaintiff sustained, the test of a factual, causal relationship is met. 256 So.2d at 622. Applying these principles to the instant case, although the cause in fact determination is not without difficulty, we cannot find that the court of appeal erred in affirming the trial court's finding that Sheriff Foti's alleged negligence in hiring, training and/or commissioning Benoit as a deputy had something to do withwas a cause in fact ofplaintiff's injuries.
*1043 Both lower courts found that Benoit lacked basic qualifications for commissioning as a law enforcement officer and that his training, especially in the use of firearms, was inadequate. More probably than not, this accident would not have happened if Benoit had possessed the basic qualifications of education, experience, intelligence and reliability, and if he had been adequately trained in the safe, responsible use of firearms.

DUTY
Duty is a question of law. Simply put, the inquiry is whether the plaintiff has any lawstatutory or jurisprudentialto support his claim. Green, The Causal Relation Issue in Negligence Law, 60 Mich. L.Rev. 543, 562-63 (1962). Answering this inquiry in the affirmative, the trial court found that "`Sheriff Foti has a duty of extraordinary care to see to it that his deputies are properly trained in the use of a dangerous instrumentality.'" 574 So.2d at 1261. The trial court further found that "`the trusting public, who permits Sheriff Foti to hire his deputies has a right to expect that they will be well trained and fully qualified in the proper and proficient use of firearms. The plaintiffs as part of that public are beneficiaries of that trust.'" Id. at 1263.
Agreeing with the trial court and expanding on the duty, the court of appeal stated:
Sheriff Foti has the obligation to ensure that those who are commissioned as deputy sheriffs have sufficient training, most particularly in the area of the use of firearms.
The law is clear that a loaded gun is a dangerous instrument and imposes a duty of care on those who have control of it. Webb v. Smith, 555 So.2d 556, 558 (La.App. 4th Cir.1989); Tolleson v. State Farm Fire and Casualty Co., 449 So.2d 105 (La.App. 1st Cir.1984), writ denied, 450 So.2d 968 (La.1984). Likewise, Sheriff Foti has a duty to ensure that the people whom he commissions as deputy sheriffs are adequately trained in the use and handling of firearms.
574 So.2d at 1263. (emphasis added).
Both the court of appeal and the trial court assumed that there exists under Louisiana law a cognizable wrong for negligent hiring of a deputy. In making this determination, the lower courts relied on the line of cases setting forth the well-settled rule that a loaded gun is a dangerous instrumentality and imposing on those in control of such weapons a duty of extraordinary care. Valence v. State, 280 So.2d 651 (La. App. 1st Cir.), writ refused, 282 So.2d 517 (La.1973); Cathey v. Bernard, 467 So.2d 9 (La.App. 1st Cir.1985); Tolleson, supra; Webb, supra. From this well-settled rule, the lower courts made the quantum leap that Sheriff Foti likewise has an "extraordinary duty" to ensure the people he commissions as deputies are qualified and adequately trained in the use of firearms.
A similar attempt to impose an "extraordinary duty" on an employer for its employee's negligent handling of a firearm was rejected in Schaeffer v. Duvall, 421 So.2d 262 (La.App. 4th Cir.1982), writ denied, 427 So.2d 1209 (La.1983). In Duvall, the plaintiff, who was injured by an offduty security guard, sued the guard's employer alleging the employer had an "extraordinary duty" to screen, train and supervise its guard as the employer had placed a dangerous instrumentalitya loaded guninto the hands of its guard. Thus, the plaintiff contended that the employer should be strictly liable under Civil Code Article 2317 for its "failure to prevent the person for whom he is responsible from causing such unreasonable risk of injuries to others." LSA-C.C. Art. 2317. Rejecting this contention, the Fourth Circuit found that the plaintiff's reliance on Article 2317 was misplaced because at the time of the accidental shooting the employee was far removed from his employer's control. We find the reasoning in Schaeffer, supra, convincing and reject the lower courts' implication that Sheriff Foti's duty was an "extraordinary" one under Article 2317.
As noted previously, courts in other jurisdictions have concluded that a governmental *1044 employer has a duty to exercise reasonable care in hiring and training police officers, a duty common to all employers. Governmental employers who negligently either hire, commission, train or retain an incompetent or unfit deputy may be liable to a third party injured by the employee's negligence.
Louisiana courts first recognized this duty of an employer to exercise reasonable care in hiring employees who in the performance of their duties are likely to subject third parties to serious risk of harm in Lou-Con, Inc. v. Gulf Building Services, Inc., 287 So.2d 192 (La.App. 4th Cir.1973), writ denied, 290 So.2d 899 and 901 (La. 1974). Cf. Morse v. Jones, 223 La. 212, 65 So.2d 317, 320 (1953) (finding that employer had no duty to investigate employee's background); See also Smith v. Orkin Exterminating Co., Inc., 540 So.2d 363 (La.App. 1st Cir.1989) (holding an employer liable for failure to exercise reasonable care in hiring and retaining employees it sends into customers' homes). We now expressly recognize the tort of negligent hiring as cognizable under Louisiana fault principles embodied in LSA-C.C. Art. 2315.
Our conclusion that Sheriff Foti had a duty to exercise reasonable care in hiring, commissioning and training Benoit, however, is only the initial step of the duty-risk analysis. As noted, a fundamental flaw in the court of appeal's analysis is that it stops at this point, leaving the more difficult legal causation questions unanswered; as the dissent aptly observed, "[t]he legal causation issue is not directly addressed." 574 So.2d at 1264. This flaw illustrates a common confusion, which we discussed in Fowler v. Roberts, 556 So.2d 1, 6 (La.1989), between the duty inquiry and the scope of protection (or scope of liability) inquiry. While the former questions the existence of a duty, the latter assumes a duty exists and questions whether the injury the plaintiff suffered is one of the risks encompassed by the rule of law that imposed the duty. Id. As our resolution of the scope of protection issue below is dispositive of this case, we pretermit the breach of duty analysis that is usually done at this point.[7]

SCOPE OF PROTECTION OF DUTY
The most critical issue in the instant case is whether the injury plaintiff sustained was within the contemplation of the duty discussed above. There is no "rule" for determining the scope of the duty. Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Edwards v. State, 556 So.2d 644, 648-49 (La. App. 2d Cir.1990). In making this policy determination, this court has previously quoted the following language from Malone, Ruminations on Cause-In-Fact, 9 Stan.L.Rev. 60, 73 (1956), which is worthy of repetition.
All rules of conduct, irrespective of whether they are the product of a legislature or are a part of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is a question that the court cannot escape.
Gresham v. Davenport, 537 So.2d 1144, 1147 (La.1989) (quoting Malone, supra) (emphasis in original). In short, the scope of protection inquiry asks "whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this *1045 manner." Crowe, supra at 906 (emphasis in original).
Generally, the scope of protection inquiry becomes significant in "fact-sensitive" cases in which a limitation of the "but for" consequences of the defendant's substandard conduct is warranted. Fowler, 556 So.2d at 6. These cases require logic, reasoning and policy decisions be employed to determine whether liability should be imposed under the particular factual circumstances presented. This is such a case. Particularly, the court of appeal's "but for" conclusion is that had Benoit not been commissioned as a deputy he would not have been carrying the gun that caused plaintiff's injuries. Roberts, 574 So.2d at 1263.
In determining the limitation to be placed on liability for a defendant's substandard conducti.e., whether there is a duty-risk relationshipwe have found the proper inquiry to be how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Hill, supra. Restated, the ease of association inquiry is simply: "How easily does one associate the plaintiff's complained-of harm with the defendant's conduct? ... Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone." Crowe, supra at 907. Absent an ease of association between the duty breached and the damages sustained, we have found legal fault lacking. Hill, supra; Sibley v. Gifford Hill and Co., Inc., 475 So.2d 315, 319 (La.1985); See also Williams v. Southfield School, Inc., 494 So.2d 1339, 1342 (La.App. 2d Cir.1986).
In the instant case, we find the ease of association between Sheriff Foti's alleged negligence in hiring, commissioning and inadequately training Benoit and the risk of injury to this plaintiff under the circumstances and in the manner the injury occurred is, at best, attenuated. Particularly, enforcement of Sheriff Foti's duty is attenuated by several factors. First, Sheriff Foti had no requirement that Benoit carry a gun on or off duty, although carrying a gun off duty by deputies was, in general, authorized and encouraged. Second, Benoit's actions in carrying a gun on the day of the accident were in violation of Sheriff Foti's written regulation prohibiting carrying firearms while drinking. Finally, Benoit's actions in engaging in horseplay with a loaded gun while intoxicated were in violation of common sense. In spite of Benoit's lack of basic qualifications and inadequate training, nothing in his employment record indicated any likelihood that he would engage in such foolhardy conduct. In sum, we find foreseeability lacking, as "we do not believe that [the sheriff] can be expected to foresee that one of his officers would violate, not only the ... regulation [regarding the handling of firearms while intoxicated], but also elementary standards of conduct relative to the use of firearms which are within the common knowledge and experience of everyone." Martin v. Garlotte, 270 So.2d 252, 254-55 (La.App. 1st Cir.1972), writ refused, 272 So.2d 376 (La.1973).
The court of appeal's holding implies that simply commissioning an inadequately trained deputy is negligence per se or that an inadequately trained deputy is a dangerous instrumentality. We reject that analysis as unsound. Hill, supra. Our law only prohibits conduct that creates an ambit of unreasonable risk of harm to others. Despite our finding above that Sheriff Foti had a duty not to commission inadequately trained deputies, the breach of that duty does not ipso facto give rise to liability. "Although [Sheriff Foti] would owe a duty to protect certain persons under certain circumstances from this risk, [he] is not an insurer against every risk of harm which is encountered in connection with [a negligently hired deputy]." Hill, 256 So.2d at 622.
As in Hill, supra, we are presented in this case with a combination of causes causing injury. While plaintiff's injuries may have been caused in part by Sheriff Foti's alleged failure to adequately train Benoit in the use of firearms, another cause was Benoit's own conduct in engaging in horseplay with a loaded gun while intoxicated. When, as in this case, a combination of causes exists, we have employed the following approach for defining the scope of protection:

*1046 The keys for the solution of the issue of responsibility when there is more than one cause-in-fact of damages are (1) a determination of the exact risk or risks anticipated by imposition of the legal duty which has been breached and (2) the legal or policy considerations which grant excuses from certain circumstances which follow an act of negligence. This requires, under the facts and the law of each case and the attendant exigencies, a jurisprudential determination which will implement and make effective our broad codal provisions concerning those who should respond in damages for their faults.
Fowler, 556 So.2d at 9 (quoting Pierre v. Allstate Insurance Co., 257 La. 471, 499, 242 So.2d 821, 831 (1970)).
We noted previously that in determining the exact risks anticipated by the imposition of the duty to use care in employing others, other courts have generally confined this duty to cases where there is a connection between the employment and the plaintiff, that is, where the plaintiff met the employee as a result of the employment and the employer would receive some benefit from the meeting had the wrongful act not occurred.
These factors are lacking in this case. Plaintiff met Benoit in a purely personal context, wholly unrelated to Benoit's employment. While it is suggested that Sheriff Foti derived some potential benefit from Benoit's choice to arm himself, as discussed above, we reject that suggestion. See Fitzgerald, supra. Thus, application of these factors reveals that the record is totally devoid of any connection between the plaintiff and Benoit's employment.
After carefully delineating the duty, it is evident that the primary purpose for imposing the duty to exercise reasonable care in hiring, commissioning and training deputies is to ensure effective and efficient law enforcement, and also to protect the public from injury caused by a deputy's negligent use of firearms while engaged in his law enforcement duties. The risk that a deputy while off duty and under no requirement to carry a gun would engage in horseplay with a loaded revolver while intoxicated, an action in violation of the Sheriff's regulations, and cause injury to plaintiff is clearly outside the ambit of protection contemplated by the imposition of that duty.
Accordingly, we find that the court of appeal erred in affirming the trial court's finding of liability on the part of Sheriff Foti. The judgment of the district court as affirmed by the court of appeal is reversed in so far as it finds Sheriff Foti liable, and the demands of plaintiff and intervenors against the sheriff are rejected.
REVERSED IN PART AND RENDERED.
CALOGERO, C.J., and WATSON and DENNIS, JJ., dissent and assign reasons.
CALOGERO, Chief Justice, dissenting.
I agree with the majority's recognition of the tort of negligent hiring under La.C.C. art. 2315. Under this statute, the majority applies a duty-risk analysis and does not differ with the lower courts' findings regarding cause-in-fact, the defendant's duty to exercise reasonable care in hiring, commissioning, and training armed employees, or with the defendant's breach of that duty. However, the majority's view of the scope of protection afforded by that duty prompts its ruling for the defendant. I disagree with the majority's finding regarding the scope of protection, and therefore dissent.
In Gresham v. Davenport, 537 So.2d 1144 (La.1989), this Court stated that the proper scope of a rule or duty must be determined in each case according to the facts of the case. Id. at 1147 (quoting Malone, Ruminations on Cause-in-Fact, 9 Stanford L.Rev. 60, 73 (1956)). In this case, the majority finds that the scope of the defendant's duty extends only to third parties who are injured by the armed employee in the course of his employment or who have some relationship to his employment. In contrast, I would find that the defendant's duty to exercise reasonable care in hiring, commissioning and training armed employees extends to all persons who might foreseeably be injured by that *1047 employee, whether the employee is on or off duty.
In this case, the defendant commissioned the employee as a deputy sheriff, authorized his carrying a gun, and encouraged him to carry his gun even when off duty. Before doing so, the employer had a duty to reasonably screen and train the employee. When an employer facilitates the arming of an employee while negligently failing to screen and train that employee, and then encourages the employee to carry his gun when off duty, it is foreseeable that he may injure someone, whether or not the injured party has some connection with the employee's employment. The majority's distinction between injured individuals who have some connection with the employee's employment, and injured individuals who have no connection, is too arbitrary to be reasonable in determining the employer's liability.
For the reasons assigned, I respectfully dissent.
WATSON, Justice, dissenting.
If the sheriff's conduct in hiring Benoit, giving him a commission and failing to train him was a cause in fact; if the sheriff had a duty (and this is obvious) which was breached, then plaintiff should recover. Recovery would be due to almost anyone who got shot accidentally by this "deputy." The absence of a situation involving policework is irrelevant: this "deputy" was a cook and not a criminal deputy. The ambit of the duty extends to plaintiff.
Additionally, an accidental shooting is a reasonably foreseeable consequence of commissioning an untrained deputy sheriff and giving him the authority to carry a concealed weapon.
Under these circumstances, the trial court and the court of appeal correctly held Sheriff Charles Foti, Jr. and his insurer liable for plaintiff's damages. I respectfully dissent.
DENNIS, Justice, dissenting.
I respectfully dissent.
There are at least three possible theories of liability in an action against an employer resulting from the negligent conduct of his employee: respondeat superior or vicarious liability, negligent entrustment (the negligence of the employer in entrusting a dangerous instrumentality to an incompetent person), and negligent hiring (the negligence of the employer in hiring, training or retaining an incompetent employee). Comment: Negligent Hiring and Negligent Entrustment: The Case Against Exclusion, 52 Or.L.Rev. 196 (1973) [hereinafter "Negligent Hiring and Negligent Entrustment"]; see S. Speiser, C. Krause, A. Gans, 3 The American Law of Torts § 4.8 (1983 & Supp. 1991); Restatement (Second) of Agency §§ 213, 219 (1958); Restatement (Second) of Torts §§ 307, 308, 390 (1965). Civil Code Article 2315's broad principle of fault is less restrictive than these named common law torts. Nevertheless, the jurisprudence from which they are derived, like that of all civilized jurisdictions, should be presented in our fora, providing that its merit and appropriateness are tested by careful reference to those general principles of liability in our Code. Stone, Tort Doctrine In Louisiana: From What Sources Does It Derive? 16 Tul.L.Rev. 489, 512 (1942).
I agree with the majority's conclusion that the theory of vicarious liability is not applicable because the employee was not in the scope of employment when he committed the negligent act. On the other hand, I believe there is a valid basis in law and in the evidence of record to hold the defendant employer liable for his negligent hiring and negligent entrustment in this case.
In order to recover on the theory of negligent hiring, a plaintiff is required to prove that an employment relationship existed, that the employee was incompetent, that the employer knew or should have known of the employee's incompetence, that the employee was negligent on the occasion giving rise to the plaintiff's injuries, and that the employer's negligence was a cause in fact and a legal cause of the harm to plaintiff. Harris v. Pizza Hut of Louisiana, 455 So.2d 1364 at 1370 (La. 1984); Smith v. Orkin Exterminating, 540 So.2d 363 (La.App. 1st Cir.1989); Lou-Con *1048 v. Gulf Building Services, 287 So.2d 192 (La.App. 4th Cir.1973), writ denied 290 So.2d 899, 901 (La.1974); Negligent Hiring & Negligent Entrustment, supra, at 298; Comment: TortsMaster Negligent HiringEmployer Owes a Duty to the General Public to Use Reasonable Care in Hiring and Retaining Employee, 9 U.Balt.L.Rev. 435 (1980) at 440-442. Thus, under this theory, the plaintiff need not prove that the employee was acting within the scope of his employment at the time of the injury caused by the employee's incompetence.
The majority acknowledges that the plaintiff proved every element of his negligent hiring cause of action against the employer except that the employer's negligence was a legal or proximate cause of the plaintiff's injury. In reversing the judgments below on this point, the majority relies on a duty risk analysis and an old fashioned proximate cause type rule gleaned from a 1977 student note in a Chicago-Kent Law Review. In doing so, my brethren in the majority failed to correctly apply either the "ease of association" element of the duty risk doctrine or modern foreseeability principles used by most jurisdictions.
The vast majority of courts hold that to establish that the employer's negligent hiring was a legal or proximate cause, proof of actual causation and foreseeability is required. F. Harper, F. James, & O. Gray, 3 The Law of Torts § 16.9 (1986); Restatement (Second) of Torts § 281 (1965) comments (e), (f). In order for the employer's negligence in hiring to be the proximate or legal cause of the plaintiff's injury, it must appear that the act of hiring (or retaining or training) the employee was one that the employer ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to other persons, either because of the employee's incompetence or unfitness or because of the employer's failure to conduct a reasonable pre-employment investigation into the employee's background. Restatement (Second) of Torts § 302 comment (j), § 307, § 307 comment (a), (b); Restatement (Second) of Agency § 213 comment (d); see F. Harper, F. James, & O. Gray, supra at 468. It is not necessary for the employer to have anticipated or foreseen the particular injury which did in fact occur. Nor is it necessary for the employer to have foreseen the particular circumstances under which the injury was suffered. It is enough to satisfy the requirement of foreseeability that the possibility of harm was clear to an ordinarily prudent person. See Kendall v. Gore Properties, 236 F.2d 673 (D.C.Cir. 1956); Edwards v. Robinson-Humphrey Co., 164 Ga.App. 876, 298 S.E.2d 600 (1982); Ponticas v. K.M.S. Investments, 331 N.W.2d 907 (Minn.1983); Di Cosala v. Kay, 91 N.J. 159, 450 A.2d 508 (1982).
This court has followed a similar rule and likewise has not required the defendant to foresee the particular accident or mechanism of injury that occurred. For example, this court has held that "a risk is not excluded from the scope of duty simply because it is individually unforeseeable. A particular unforeseeable risk may be included if the injury is easily associated with the rule relied upon and with other risks of the same type that are foreseeable and clearly within the ambit of protection." Carter v. City Parish Government of East Baton Rouge, 423 So.2d 1080, 1086 (La. 1982) (emphasis added.) See also Forest v. State through La. Dept. of Trans. & Development, 493 So.2d 563 (La.1986); Weber v. Charity Hosp. of La., 475 So.2d 1047 (La.1985); Hill v. Lundin, 260 La. 542, 256 So.2d 620 (1972); Crowe, The Anatomy of a TortGreenian, as Interpreted by Crowe who has been Influenced by MaloneA Primer, 22 Loy.L.Rev. 903 (1976) at 912; Malone, Ruminations on Cause-in-Fact, 9 Stanford L.Rev. 60 (1956).
In the present case the risks of great harm to members of the public by the defendant employer's negligent acts were foreseeable, within the scope of his duty to protect against risk of harm to third persons or easily associated with such risks. The defendant employer did not make any pre-employment investigation into the employee's background and capacity to serve as a law enforcement officer. Considering the likelihood that the employee's badge *1049 and his ability legally to carry concealed firearms could subject third persons to serious risk of great harm, the standard of care and the duty to investigate should have been relatively high. See Kendall v. Gore Properties, supra; Williams v. Feather Sound, 386 So.2d 1238 (Fla.App. 1980), petition denied 392 So.2d 1374 (Fla. 1981); McCrink v. City of New York, 296 N.Y. 99, 71 N.E.2d 419 (1947); Estate of Arrington v. Fields, 578 S.W.2d 173 (Tex. Civ.App.1979); Cause of Action Against Employer for Negligent Hiring of Employee, 4 COA 285 at § 9 (1984). It is clear that the defendant employer failed to meet even a minimum standard for pre-employment screening, however, and that he therefore overlooked or disregarded that the employee had no more than a ninth grade education, that he had been convicted of DWI, and that he had performed unsatisfactorily on his IQ test. It is also self-evident that the perfunctory training the defendant gave the employee was inadequate and was never actually intended to equip him to be a competent law enforcement officer. Most important, the one day of firearms training the employee received fell far below both national and state standards. Furthermore, the employee was given no further tests or training as a follow-up to make certain he understood the great dangers in associating arms with alcohol and knew how to handle firearms safely. The negligent hiring and training were especially significant in the present case because the evidence clearly indicates that but for the deputy's receipt of a commission he more than likely would not have purchased and carried the handgun. According to the testimony of Deputy Benoit and of the plaintiff's expert in police training, although he had been authorized and encouraged to carry a concealed weapon, the employee was in fact unfamiliar with the basic features of the handgun he carried and was ignorant of the proper way to pass a handgun from one person to another. Thus, without properly screening, training or testing, the defendant employer commissioned the employee as a deputy sheriff, exempted him from the criminal statute that forbids the carrying of a concealed weapon, and informed him that it was the employer's policy to encourage deputies to carry a weapon at all times.
Under these circumstances, the defendant employer breached his duty to conduct a reasonable pre-employment investigation into the employee's background, his duty to give training to the employee meeting minimum national and state standards, and his duty to ascertain that the employee could meet these minimum standards of firearm safety and competence. Thus, the defendant employer either knew or should have known that the employee was incompetent to be a police officer in the beginning, that he had not been improved by the superficial course of training, and that it would create a risk of great harm to third persons for such an employee to carry weapons, concealed or otherwise, on duty or off. Nevertheless, the defendant employer knowingly encouraged the employee to carry firearms concealed on his person during his off duty hours. Although the firearm risk that resulted in the accident in this case may not have been individually foreseeable in precise detail, it was a rather typical handgun risk that is easily associated with other risks of the same type that foreseeably would be created by commissioning an incompetent, ill-trained police officer. Because it is clearly within the scope of the defendant employer's duty to prevent incompetent, ill-trained officers from carrying weapons, concealed or unconcealed, on duty or off, as part of the employer's general overall duty to protect the public, the employer's negligent hiring, training and retaining the employee was clearly a legal or proximate cause of the accident and within the ambit of protection he was obliged to afford.
The reasons the defendant employer should be held liable for negligent entrustment are overlapping and may be summarized more briefly. In a negligent entrustment action plaintiff generally must allege and prove that the entrustee was incompetent, inexperienced, or reckless; that the entrustor knew or had reason to know of the entrustee's incompetency; that there was an entrustment of a thing; that the *1050 entrustment created an appreciable risk of harm to the plaintiff and a duty on the part of the defendant; and that defendant's negligence caused the harm of the plaintiff. Negligent Hiring and Negligent Entrustment, supra, at 299. In the present case, the defendant employer did not directly entrust to the employee the weapon which injured the plaintiff. However, the employer indirectly provided the handgun to the employee by commissioning him as a deputy sheriff with the legal ability to carry concealed weapons and by officially adopting an employment policy that encouraged him to carry a weapon concealed on his person while off duty. See, e.g. Restatement (Second) of Torts §§ 307, 308, 390. Under these circumstances, because the employer knew or should have known that the deputy was incompetent and illtrained to handle firearms, the risk that the deputy would nevertheless carry firearms at all times and would cause great harm to a third person by misusing a firearm was certainly foreseeable, within the scope of the employer's duty to protect against and/or easily associated with other risks clearly within the ambit of protection.

ON REHEARING
COLE, Justice.
This is an action ex delicto for damages sustained when a cook, commissioned as a deputy, accidentally fired a gun, seriously injuring the plaintiff. The plaintiff, Bobby Ray Roberts, joined by intervenor, Kathy Roberts, his now ex-wife, for herself and their three minor children, brought suit against the cook/deputy, Joseph Benoit; the State of Louisiana; the City of New Orleans; the Parish of Orleans; the Orleans Parish Criminal Sheriff's Office; Sheriff Charles Foti, Jr., individually; and, Southern American Insurance Co., the insurer for the Criminal Sheriff's Office.[1]
After a bench trial, judgment was rendered against three defendants: Benoit, the Sheriff's Office, and the Insurance Guaranty Association. Benoit was found to be negligent, as was his employer, the Orleans Parish Criminal Sheriff's Office, for negligently hiring and training Benoit. The judgment, in favor of the plaintiff and intervenors, awarded them damages in the amounts of $785,000 and $55,000, respectively. The court of appeal affirmed, with one judge dissenting in part. 574 So.2d 1256. The dissent would not have found the sheriff primarily liable, but rather vicariously, believing Benoit's carrying of an off duty weapon to have been in furtherance of the sheriff's business.
The Sheriff's Office appealed and we granted certiorari. 575 So.2d 816 (La. 1991). On original hearing, finding no legal cause, we reversed in part, absolving the Sheriff's Office of liability on both theories advanced, viz. primary liability, stemming from negligent hiring and training, as well as vicarious liability, flowing from Benoit's negligent acts in the course of his employment. On rehearing, while reaffirming our original ruling, we seek to refine our decision, primarily with respect to the issue of legal cause.
On first hearing, 586 So.2d 131, 133 (La. 1991), the facts were accurately laid out thus:
"In March 1979, Sheriff Foti hired the defendant Benoit as a cook. In January 1981, Sheriff Foti commissioned the kitchen workers, including Benoit, as deputy sheriffs, enabling them to receive state supplemental pay. Before being commissioned, the kitchen workers completed a training course. Training was given on an intermittent basis over a six-week period and included only one day (eight hours) of firearm training.
"During the training course, the trainees were instructed that while off duty, it was better to have a gun and not need it than to need a gun and not have it, thereby impliedly encouraging deputies to carry a gun while off duty. The trainees were also given a copy of department regulations stating that when engaged in recreational *1051 activities which include the consumption of alcohol, a deputy should in all cases remove his firearm to a safe place, or leave it at home, before commencing with such activities. The regulations also stated that a weapon should be drawn only when one's life is in danger, or the use of deadly force is anticipated.
"On October 25, 1981, the day of the accident, Benoit completed his regular kitchen duties at 2:30 p.m. After work, Benoit went home, bathed, changed clothes and went to his mother-in-law's home. Benoit then went to the home of his brotherin-law, Merlin Fontenette. While at Fontenette's home, Benoit drank a beer. Benoit and Fontenette then went to plaintiff's home to have plaintiff repair a broken light in Benoit's car. When they arrived at plaintiff's home, plaintiff was installing a stereo in another vehicle, and Benoit was drinking another beer. While there, Benoit drank a glass of wine and, by this time, was staggering a little.[2]
"Benoit had in his possession two weapons: a[n] M1 carbine rifle which was in the trunk of his car, and a .38 caliber Charter Arms revolver purchased by him after he was commissioned as a deputy which was in an ankle holster on his leg. While at plaintiff's home, Benoit removed the revolver from the holster and played with the revolver for a period of almost forty-five minutes before the accident occurred. During this period, Benoit handed the revolver to Fontenette, who handed it back to Benoit; and, at one point, when the bullets fell from the revolver, plaintiff picked them off of the floor and handed them back to Benoit. Benoit cocked and uncocked the gun. During this period, plaintiff asked Benoit to put the gun away several times. Thereafter, the revolver discharged, severely injuring plaintiff."
The district judge, in his reasons for judgment, stated "it is not clear whether Mr. Benoit was ever called upon to perform any duties other than those of a cook following his initial employment, he testified that subsequently he took the test for `deputy sheriff' and that he was taken to the firing range." However, Benoit appears to have been commissioned in name only. He was not required to carry a gun, nor was he issued one. The gun used in the accident was one he purchased himself, although his exact motivations in buying it are unclear. Because he has only a ninth grade education, performed poorly on an I.Q. test, and concealed a DWI conviction on his application for employment, Benoit undoubtedly was not qualified to engage in the full panoply of a deputy's duties. However, these shortcomings would only have been important had Benoit been acting as a deputy rather than as a cook or any private citizen.

LAW
To prevail on a negligence claim under La.Civ.Code arts. 2315[3] and 2316[4], a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element). Fowler v. Roberts, 556 So.2d 1,4 (La.1989). In our original opinion we found the plaintiff had proven all elements except the fourth, legal cause. We adhere to that basic position.
*1052 However, we clarify the cause-in-fact element in one respect. This case appears to be a close one on the issue of cause-in-fact. It is likely that this accident might have occurred had Benoit, who already owned a weapon, never been commissioned. Thus, it is impossible to say with any degree of certainty, "but for" the sheriff's conduct, this accident would not have happened. Nonetheless, inasmuch as the sheriff's actions can be said to have appreciably enhanced the chance of the accident occurring, they are a cause-in-fact of the accident. Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821, 831 (1970), on rehearing; see also, Wex Malone, Ruminations on Cause-in-Fact, 9 Stan. L.Rev. 60, 74 (1956).

LEGAL CAUSE: THE THEORY
As we stated in our original opinion: "Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy ..." 586 So.2d at 142.[5] While we maintain the truth of this assertion, we feel an in-depth analysis of legal cause would be helpful.
Defining legal or proximate cause has proved to be a herculean task for the judiciary in all places and all times. The very term "proximate cause" is fraught with confusion, as it has nothing to do either with cause or proximity. Moreover, it is not to be mistaken for cause-in-fact, as the two elements satisfy entirely different functions in the negligence analysis. See Wex Malone, Ruminations on Cause-in-Fact, supra. To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred. Timothy J. McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227, 1231 (1984) (hereinafter cited as "McNamara"). Once it is determined the conduct is a cause-infact of the injury, all causation inquiries are complete.
"The problem [of proximate cause is] not one of causation for which it has been so often mistaken, but one of defining the boundaries of the rule invoked." L. Green, Rationale of Proximate Cause, at 17 (1927). Because substandard conduct does not render the actor liable for all consequences spiralling outward until the end of time, the concept of proximate cause, or one of its functional equivalents, such as scope of the duty in duty-risk analysis, is necessary to truncate liability at some point. The primary inquiry, then, in a proximate cause determination is: "whether plaintiff will be granted the legal system's protectionthat is, will the defendant be required to have met a specified standard of conduct in the case at issue or be subject to liability." E. Wayne Thode, Tort Analysis: Duty-Risk v. Proximate Cause and the Rational Allocation of Functions Between Judge and Jury, 1977 Utah L.Rev. 1, 10 (1977). "This is a policy decision in purest form." Id.
The history of proximate cause theory is long and rich. The term has been traced to the seventeenth century, to Francis Bacon's first maxim, which is translated as: In law not the remote, but the proximate cause is looked at.[6] The maxim appears to have been, however, simply a device, used to understand and classify disparate rules. Kelley at 56. The trail becomes quite cold until the middle of the nineteenth century when "[m]odern proximate cause doctrine in tort law seemed to spring up, without identifiable tort law antecedents...." Id.
After the doctrine, the commentators in turn sprang up. Addison, author of the first major torts treatise, wrote:
If the wrong and the legal damage are not known by common experience to be *1053 usually in sequence, and the damage does not, according to the ordinary course of events, follow from the wrong, the wrong and the damages are not sufficiently conjoined or `concatenated as cause and effect to support the action.'
C. Addison, Wrongs and Their Remedies, Being a Treatise on the Law of Torts at 4 (1860), cited by Kelley at 72.
Another early scholar of the subject, Frederick Pollock, wisely eschewed philosophical and metaphysical inquiries into the nature of proximate cause concluding it was a common sense rule which cut off liability for harm a reasonable person in the defendant's position would not have foreseen. Kelley at 73. Specifically, Pollock opined:
There is a point where subsequent events are, according to common understanding, the consequence not of the first wrongful act at all, but of something else that has happened in the meanwhile, though, but for the first act, the event might or could not have been what it was.... In whatever form we state [the rule of proximate cause], we must remember that it is not a logical definition, but only a guide to the exercise of common sense.
Kelley at 81, citing F. Pollock, The Law of Torts at 32-33 (1887).
The first major step towards the development of modern legal cause theory came in 1909 with Joseph Bingham's duty-purpose analysis. Kelley at 82. Bingham was among the first to recognize that after the initial but-for, cause-in-fact inquiry, all causation analysis ceases. According to Bingham, legal cause was not a remoteness of consequences issue but rather a scope of duty inquiry. Id. He believed specific, concrete duties must be ascertained in order to establish the purpose of the duty and then to determine how far the duty extends. Id. at 83.[7] His theory did not gain wide acceptance, however, because it ran counter to the predominant theory of negligence liability, which held that the duty in a negligence case was a very general duty to avoid conduct posing a foreseeable risk of harm to others. Id. at 91.
The theory of legal cause was greatly clarified by Leon Green's 1927 book, The Rationale of Proximate Cause, which set forth the duty/risk analysis. Kelley at 94. Green reconciled Bingham's theory with modern tort law. According to Green, a court using the duty/risk analysis must make a policy decision when deciding whether the legal rule allegedly violated by the defendant protects the affected interest from the particular hazard encountered. Id. at 95. Foreseeability, though a part of the duty/risk analysis, was considered by Green to be merely a legal fiction useful in instructing juries. Id. at 96. Other commentators have realized that some construct like foreseeability is necessary if judges are to palm off the theretofore legal question of legal cause as a factual one to be decided by juries. See, e.g., McNamara, supra, at 1228.
The next bench mark in the development of proximate cause theory is the oft-cited Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928). Kelley at 96. Palsgraf was injured when a porter pushed another passenger onto a train, causing the passenger to drop his package, which contained fireworks, onto the track. The ensuing explosion knocked over some scales, hitting Palsgraf in the head. Cardozo's majority opinion held Palsgraf was an unforeseen plaintiff. As such, she was not owed a duty by the railroad. The dissent took issue with such a narrowly tailored duty, arguing "Every one owes to the world at large the duty of refraining from those acts that may unreasonably threaten *1054 the safety of others." 162 N.E. at 103. The dissent thus posits as a limiting principle the unreasonableness of acts. To determine what unreasonably threatens the safety of others, however, one must descend, as Cardozo did, to the level of specific facts.
Prosser notes that Palsgraf is cited in a wide array of negligence cases and in particular by a "long list of cases in which no injury to anyone was to be anticipated, and therefore there was simply no negligence at all." W. Keeton, D. Dobbs, R. Keeton, and D. Owen, Prosser and Keeton on the Law of Torts, § 43 at 285 (5th ed. 1984). We find this case to be such a case. In reaching the conclusion that no injury could reasonably have been anticipated from promoting a cook to a deputy in name only, it is critical to enunciate what duty the sheriff allegedly breached. We are mindful of Professor Green's words: "[t]he court ... cannot escape the necessity of outlining or defining in every case the rule relied on so that it may appear clearly enough for the court both to determine its appropriateness and to measure its bounds. Otherwise the court's judgment as to whether the particular hazard falls within the reach of the rule will have the same haziness as the conception of the rule itself." L. Green, Rationale of Proximate Cause at 41 (1927).
In our original opinion we stated the sheriff has a duty to commission as deputies only competent law enforcement officers. Upon reconsideration, we find that the duty implicated by this case is actually much narrower, viz., the duty not to promote a cook to deputy in name alone, that is, not to engage in ersatz promotions. Hence, though we conclude that the sheriff may have acted in a suspect manner in finessing supplemental pay for kitchen workers by titularly promoting cooks to deputies, the duty to refrain from so doing does not stem from the risk that such a cook might harm someone as a result of this paper-promotion. Such a duty not to play havoc with the public fisc has, as its primary goal, the integrity of pay scales, not the safety of the public encountering cooks who are paid as deputies. Ultimately, however, whether the duty is characterized broadly or narrowly, the outcome in this case remains the same. We do not quibble with the opinion on original hearing, we simply feel it was generous in its characterization of the duty.
American tort law today recognizes two strains of proximate cause theory: Prosser & Keeton's realist approach, which emphasizes judicial policy-making, and Harper, James, & Gray's[8] descriptive theory, which seeks to limit liability on the basis of foreseeability. Kelley at 104. In our original opinion, we made both a policy decision and a foreseeability determination. The critical test in Louisiana, however, is phrased in terms of "the ease of association" which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant? McNamara, supra, at 1234.

LEGAL CAUSE: THE PRACTICE IN LOUISIANA
The cases on legal cause are many and diverse. Our modern jurisprudence begins with the seminal duty-risk case, Dixie Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962), in which this Court held:
The essence of the [legal cause] inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the [duty].... Specifically, it involves a determination of whether the ... duty of displaying signal flags and responsibility for protecting traffic were designed, at least in part, to afford protection to the class of claimants of which plaintiff is a member from the hazard of confused or inattentive drivers colliding with stationary vehicles on the highway.
Id. 137 So.2d at 304. In this case, the inquiry becomes whether the duty not to promote a cook to deputy, in name only, is *1055 meant to protect the class of claimants, of which plaintiff is a member, from the risk that the cook will: acquire, of his own accord, the trappings of a deputy; while off-duty, become intoxicated; play games with his loaded gun; and, in the process, inadvertently shoot someone. We do not think the duty encompasses such a farflung hazard, dependent as it is on the unpredictable and idiosyncratic foibles of one person. While it is not necessary that the exact risk encountered be foreseeable, it is unrealistic to expect the sheriff, who promoted Benoit simply to put him on the supplemental pay rolls, could have expected any harm to result from this maneuver. The facts indicate that what little training Benoit received, he received as a matter of form alone.
Every negligence case must be decided on its own facts and circumstances. Foggin v. General Guaranty Insurance Co., 250 La. 347, 195 So.2d 636, 640 (1967). Hence, it is essential to keep the facts of this case clear. Benoit was a cook who, even after being nominally commissioned as a deputy, worked in the kitchen. He was neither required to carry, nor was he issued, a gun. He bought the revolver used in this incident on his own for reasons not entirely clear on the record, perhaps as an "off-duty" weapon, or perhaps for his wife's protection.
In Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972), we adopted the ease of association test, which asks how easily the risk of harm can be associated with the rule which was breached. Although we noted "[f]oreseeability is not always a reliable guide," id., we nonetheless found "[t]he record ... devoid of any evidence tending to establish that the defendant could have reasonably anticipated that a third person would move the ladder and put it in the position which created this risk [of being tripped over], or that such a `naked possibility' was an unreasonable risk of harm." Id. at 623.
Since Hill, supra, this Court has decided a variety of legal cause cases. In Laird v. Travelers Insurance Co., 263 La. 199, 267 So.2d 714 (1972), another traffic accident case, we found foreseeability to be a more appropriate test when only a single actor is involved. Id. at 719 n. 1. Specifically, we held the defendant's duty to move his trailer entirely off the road when stopping did not encompass the risk that a completely inattentive driver would rear-end the trailer, despite the lack of traffic and ample room to pass. Id. Cf. Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970), on rehearing, in which the duty to move the vehicle from the road was held to be a legal cause of the accident. Laird and Pierre, supra, taken together, evidence the highly fact-intensive nature of the duty-risk analysis. While factually Laird bears a strong resemblance to Pierre and Dixie, supra, the variations lead to an entirely different outcome.[9] Because the legal cause analysis is so factbound, other legal cause cases serve only as examples of the methodology and can only be analogized from when the facts bear a striking resemblance to the case to be decided. With this cautionary remark, we resume our summary of legal cause decisions.
It is well settled in Louisiana law that an intervening act does not automatically absolve a prior negligent party from liability. In Hernandez v. Toney, 289 So.2d 318 (La. App. 1st Cir.1973), the court held an apartment manager liable for requiring an unattended five-year-old to leave the fenced playground and not notifying the child's mother. The child was later hit by a car in the parking lot, yet the driver's intervening act, was held to be an easily foreseeable result of the manager's conduct. Id. at 321. Thus, the risk of harm was easily *1056 associated with the duty imposed on the manager.
We find an older case, Jones v. Robbins, 289 So.2d 104 (La.1974), particularly apposite. In Jones, four-year-old Candy threw a match into some gasoline seriously injuring herself. A service station attendant had sold a plastic container of gasoline to Candy's half-sister, six-year-old Penny. In Jones, we asked whether "the risk that Penny's four-year-old half-sister would throw a lighted match into the gasoline, [is] encompassed within the duty of the attendant not to place the gasoline in the hands of the six-year-old?" We found that it was, stating: "Particularly included within the risk of harm to others is the fact that, with the expectation of child group play, an easily associated risk is that some other incompetent, by reason of tender age, would misbehave or would misuse the gasoline." Id. at 107.
In the instant case, however, commissioning Benoit as a deputy, instructing him, cursorily, on the use of guns, and making the rather obvious statement that it is good to have a gun when one is needed, is a far cry from handing a dangerous instrumentality to a child. We do not presume, despite Benoit's limited education and poor performance on an I.Q. test, to consider a functioning member of society, employed as cook, to be of such diminished intellectual capacity that he cannot be held to appreciate the danger involved in playing with a loaded gun while intoxicated.
Four years after the Jones case, supra, we decided LeJeune v. Allstate Insurance Co., 365 So.2d 471 (La.1978), in which a deputy failed to secure an intersection. We found:
Deputy Smith, 68 years of age, had never before led a funeral procession on this route. He was untrained in the manner in which such a procession was to be escorted, and in the manner in which intersecting avenues of travel should be secured to allow unimpeded travel to a funeral cortege.
Id. at 474. His negligence was held to be a legal cause of the accident. Although there were other negligent parties, an inattentive hearse driver and a speeding motorist, the deputy's negligence was held to be a legal cause of the accident because his duty to secure the intersection clearly encompassed the risk that there might be a collision. Because the deputy was within the scope of his employment, the sheriff's office was vicariously liable. Unlike this case, LeJeune involved an on-duty deputy. Nonetheless, the case is instructive here because it highlights the purpose of the duty to train properly, which is to insure that deputies perform their law enforcement duties competently.
As we stated in Sinitiere v. Lavergne, 391 So.2d 821, 825 (La.1980), "[l]egal cause requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character," citing Dixie Drive It Yourself System, supra. In Sinitiere, the state was found liable for the failure to repair a rut on the shoulder of a road, the rut having been determined to be a legal cause of the motorist's accident. In this case, we do not find the relationship between the Sheriff's activities and the injury to be substantial.
This Court denied recovery a few years later in PPG Industries, Inc. v. Bean Dredging, 447 So.2d 1058 (La.1984), in which the plaintiff sought to recover its indirect economic losses from the tortfeasor who damaged a third party's pipeline. This Court found that the duty not to damage someone else's property did not encompass the risk that the other party's business arrangements would be affected. In essence, the Court held that the purpose of the duty was not substantially related to the risk of harm, i.e., there was no ease of association.[10]
*1057 In more recent years, this Court has sometimes borrowed a page from common law, at least as a starting point. James Michael Chamblee, Note, Murray v. Ramada Inns, Inc.: The Expansion of Duty: A Step Towards the Reestablishment of Proximate Cause, 49 La.L.Rev. 1003, 1018 (1989). For instance, in Pitre v. Opelousas General Hospital, 530 So.2d 1151 (La. 1988), the Court found duty-risk, though more conducive to policy-making determinations, is not always the most helpful analysis. It is, concluded the Court, most beneficial in determining whether the relationship between the class of plaintiff and the class of defendant is sufficiently strong to impose a duty on the defendant. Id. at 1155. In Pitre, the Court held the doctor who had negligently performed a tubal ligation responsible only for reasonably foreseeable damages, such as the expenses incurred during pregnancy and delivery. The Court declined to use hindsight to find the doctor liable for damages from all potentially discoverable risks. Accordingly, the doctor was found to be not answerable for the damages stemming from the risk that the child would be born with a disorder, such as albinism.
Duty-risk analysis is still the usual method by which a court should determine which risks are compensable and which are not. In Gresham v. Davenport, 537 So.2d 1144, 1147 (La.1989), this Court held that "the particular risk encountered by serving beer to Ford, a passenger in a vehicle, that he would grab the steering wheel and cause an accident cannot be easily associated with Molly's [the underage hostess'] conduct in providing the beer."
Later the same year, the Court decided St. Hill v. Tabor, 542 So.2d 499, 502 (La. 1989), finding that "Falgout acted unreasonably by hosting a swimming party with such a large number of people, serving alcoholic beverages to minors, allowing the swimmers to engage in horseplay, allowing the swimming to continue once the water became cloudy, and failing to provide a non-party-participant life guard" and that this negligence encompassed the risk that someone would drown.
Recent cases have run the gamut from the mundane, Morris v. Orleans Parish School Board, 553 So.2d 427, 429 (La.1989) (duty to keep drinking fountains in repair encompasses the risk that student might slip and fall on the wet asphalt while running towards the fountain during school hours) to the monumental. LeJeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990) (duty not to neglect hospital patient encompasses risk that patient's wife will suffer emotional distress from conditions to which her husband was negligently subjected); Ermert v. Hartford Insurance Co., 559 So.2d 467 (La.1990) (fence company's chief executive officer was acting within the scope of his employment while at hunting camp because camp was used to further business purposes); and, Clomon v. Monroe City School Board, 572 So.2d 571 (La.1990) (duty of school bus driver not to prematurely deactivate warning devices when discharging children encompassed risk that auto driver might suffer emotional distress as result of hitting child).
The courts of this state have had three decades since Dixie Drive It Yourself, supra, was handed down to hone the dutyrisk analysis. In light of the jurisprudence on legal cause, it is our considered judgment that the ambit of the duty not to manipulate classifications, not to promote a cook to a deputy, solely to enable the cook to receive supplemental pay, cannot be cast so broadly as to encompass the risk that the titular deputy might harm someone. Although LeJeune and Clomon, supra, decimated *1058 the class of plaintiffs who would otherwise be Palsgraf-plaintiffs and Ermert, supra, swelled the ranks of those engaged in business pursuits, the facts of this case leave little room for further expanding liability.
Much has been made in this case about the sheriff's including in his training of the kitchen workers the epigram: it is better to have a gun and not need it than to need a gun and not have it. The plaintiff contends this suggestion is tantamount to entrusting a gun to Benoit, though Benoit was never required to have, nor was he issued, a gun. We do not believe a passing remark about the advisability of possessing a weapon amounts to constructive entrustment. In brief, the plaintiff argues that Benoit, as a deputy, was allowed to carry a concealed weapon. Because concealment of the weapon had nothing to do with the accident in this case, however, we find the argument unpersuasive.
Moreover, the spectrum of liability appears to us to be this: at the no-liability end of the scale is entrusting a gun to a well-trained and qualified officer; at the certain-liability end of the scale is entrusting a gun to a child,[11] with "entrustment" to Benoit lying somewhere between the two. The plaintiff argues entrustment to Benoit is more akin to entrusting a gun to a child. Were we to agree with the plaintiffs, virtually anyone who was actually responsible for putting a lethal weapon in the hands of an adult who was not welltrained with the weapon would be negligent. Interestingly, Professor Robertson, in his Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1973), once posed the following hypothetical: "If I hand an eight-year-old child a loaded shotgun; if he takes it home and gives it to his father; if that night his father gets drunk and kills your prize heifer, ... [the odds are] nine to one that I escape liability to you, even though: (1) I was negligent ... [and] (2) [m]y conduct a cause of your loss." Id. Robertson concludes the initial giver's negligence was not a proximate cause of the loss, that "too much else has intervenedtime, space, people, and bizarreness." To hold the Sheriff's Office liable here would be to succumb to the notion that Benoit is but an empty vessel, suggestible and devoid of personal responsibility. Although a cook with a ninthgrade education, Benoit was an average, functioning member of society, acting on his own initiative, off-duty, on business farremoved from anything which could be even remotely associated with the work of the Sheriff's Office. Although more training might have made a marksman of Benoit, the accident occurred because he played with a gun while intoxicated.
As noted earlier, negligent hiring has also been put forth as a theory of liability. Once again, however, because Benoit's titular promotion did not in any way give him an opportunity he did not otherwise have, to engage in the conduct which lead to this accident, we find no merit in this theory. Cf. Smith v. Orkin Exterminating Co., 540 So.2d 363 (La.App. 1st Cir.1989) (in which an exterminator, while on the job, unlatched windows, so that he could return later to rape a customer).
In sum, our findings are: (1) the Sheriff's Office is not vicariously liable because *1059 Benoit was clearly outside the scope of his employment; contrary to the dissent in the court of appeal decision, however, Ermert, supra, does not dictate finding vicarious liability, because Benoit was not furthering his employer's business at the time of the accident; (2) the Sheriff's Office is not primarily liable on the basis of negligent entrustment because it neither gave Benoit, nor required him to carry, a gun; and, (3) the Sheriff's Office is not primarily liable on the basis of negligent hiring because Benoit was a cook in reality and a deputy in title only; thus, the plaintiff and intervenors are not within the class of people sought to be protected by imposing the duty on the sheriff not to promote, in name only, a cook to deputy. Moreover, even assuming Benoit was a deputy in fact as well as in name, he was not engaged in any law enforcement activity at the time of the incident.
The judgments of the lower courts, insofar as they find Sheriff Charles Foti, in his capacity as Criminal Sheriff in and for the Parish of Orleans, and the Louisiana Insurance Guaranty Association liable, are reversed.
REVERSED IN PART AND RENDERED.
LEMMON, J., concurs and assigns reasons.
DENNIS, J., dissents with reasons.
CALOGERO and WATSON, JJ., dissent and assign reasons.
LEMMON, Justice, concurring.
Under the duty-risk analysis the duty allegedly violated by the Sheriff was to hire persons capable of being trained to perform the duties of a deputy sheriff and to train deputies adequately in the proper use of guns before issuing a commission. It is a close question whether any further pre-employment screening or post-employment training would have prevented Benoit from taking the loaded gun on his personal trip after working hours to have his car repaired and from carelessly playing with the loaded gun for forty-five minutes while in an intoxicated condition. Because Benoit also owned another handgun and a rifle, the latter being in his trunk at the time of the incident, the accident arguably would have happened just as it did, even with better employment practices and training by the Sheriff's Office. Nevertheless, Benoit had never carried a hidden gun on his person prior to the commission and at the time of the incident was carrying the gun he bought after the commission.
Cause-in-fact is primarily a factual determination, and a rational trier of fact might reasonably conclude on this record that, but for the negligent issuance of the commission, Benoit would not have been carrying the gun on his person on the day of the accident and bragging about his status as a police officer commissioned to carry a weapon, and that the accident would not have occurred as it did if Benoit had not been issued the commission.
Nevertheless, the duty-risk analysis turns in this case on the scope of the duty inquiry. That inquiry is whether the duty or rule of law was designed to protect the affected interest from the particular hazard encountered. Leon Green, The Rationale of Proximate Cause 126-127 (1927). Here, the Sheriff's duty to hire persons capable of being trained to perform the duties of a deputy sheriff and to train deputies in the proper use of guns before issuing a commission to carry a weapon did not encompass the risk that the employee, hired as a cook and assigned only to perform duties as a cook,[1] would purchase a gun on his own after being commissioned as a deputy solely for the purpose of receiving state supplemental pay,[2] would *1060 take the gun on an off-duty trip to have his personal car repaired, would become intoxicated while on that personal mission, would handle the gun with utmost carelessness in total disregard for the safety of himself and others (in violation of the rules of common sense) and while drinking freely of alcoholic beverages (in violation of the written and verbal regulations communicated to all employees), and would injure a person who had asked him numerous times to put the gun away (an entreaty which apparently failed because of Benoit's intoxicated condition).
The extent of the scope of the duty is primarily a policy decision. On the facts in this record viewed in the light most favorable to the prevailing party in the trial court, I cannot find any ease of association between the duty that was breached and the injury that occurred.
CALOGERO, Chief Justice, dissenting.
I disagree with this court's determination on rehearing regarding the duty implicated in this case, which the majority defines as "the duty not to promote a cook to deputy in name alone, that is, not to engage in ersatz promotions." Our original opinion properly construed the duty at issue as the "duty to exercise reasonable care in hiring, commissioning and training" deputy sheriffs.
The majority further finds that the sheriff promoted Benoit to the position of deputy sheriff for the sole purpose of putting him on the supplemental pay rolls and that the sheriff could not have expected any harm to come of this maneuver. However, rather than merely giving Benoit a "paperpromotion," the sheriff's office gave Benoit some cursory training in the use of firearms, sufficient to lead him to believe that he was a full-fledged deputy sheriff with authority to carry arms, but insufficient to properly train him. In addition to its failure to properly train Benoit, the sheriff's office neglected to exercise reasonable care in hiring and commissioning Benoit as a deputy, a position for which he was not qualified.
Furthermore, for the reasons expressed in my dissent to the original opinion, I disagree with the majority's conclusion that the sheriff is not liable because, "even assuming Benoit was a deputy in fact as well as in name, he was not engaged in any law enforcement activity at the time of the incident." Such a distinction between injuries connected to the employee's employment, and injuries with no connection, draws an arbitrary and unreasonable line in determining an employer's liability.
WATSON, Justice, dissenting.
The only difficult issue in this case is factual causation.
Benoit was commissioned as a deputy sheriff, despite knowledge that: (1) his employment application was "falsified"; and (2) the examining officer did not recommend employment because of his 83 IQ test result. Commissioning Benoit, failing to give him proper training and encouraging him to carry an off-duty service revolver was negligent. Was this negligence a cause in fact of the harm to Roberts?
Concerning causation, Dean Prosser wrote:
This is a question of fact. It is, furthermore, a fact upon which all the learning, literature and lore of the law are largely lost. It is a matter upon which any layman is quite as competent to sit in judgment as the most experienced court. For that reason, in the ordinary case, it is peculiarly a question for the jury. W. Prosser, Handbook of The Law of Torts § 41, p. 237 (4th ed. 1971).
And, Dean Prosser added:
... It is a matter of what has in fact occurred. A cause is a necessary antecedent: in a very real and practical sense, the term embraces all things which have so far contributed to the result that without them it would not have occurred. Id.
The trial court, who heard the witnesses and viewed the evidence, decided that the sheriff's negligence was a factual cause of *1061 the harm to Roberts. After a careful review, the court of appeal's thoughtful opinion affirmed that decision.
The late Justice Albert Tate, in an often quoted passage, spoke about the function of the respective courts:
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error.... The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Company, 283 So.2d 716 at 724 (La.1973).
The question narrowly posed is the function of the Supreme Court: after the trial court (or a jury) has rendered a considered decision on the issue of cause in fact and after a court of appeal has thoroughly studied and affirmed that decision, what is the standard of review?
The courts of appeal are instructed by Canter and other decisions that they must find the trier of fact clearly wrong or manifestly erroneous before reversing. It follows that the Supreme Court must give great deference to factual findings which have been affirmed. Only in rare and unusual cases should the highest court reverse affirmed findings of fact.
Such a policy comports with Dean Prosser's analysis of cause in fact; he focuses on the jury, but the analysis applies to any trier of fact.
When the Supreme Court accords great deference to affirmed findings of a trier of fact, the "proper allocation of trial and appellate functions," in Justice Tate's phrase, is completed.
In 1991, this court amended its rules to indicate considerations which will ordinarily be present for a grant of review. Notably missing from the grounds is any reference to review of facts. This is not to say that the Supreme Court will never review facts; rather, the rule signals a reluctance to reverse factual findings which have been studied and affirmed by a court of appeal.
The trial court stated:
... that the trusting public, ... permits Sheriff Foti to hire his deputies ... [expecting] that they will be well trained and fully qualified in the proper and proficient use of firearms.
Benoit had:
... the unfettered right, power and duty to carry a loaded weapon. This is an awesome privilege and responsibility to confer upon someone who had had little formal training who is prone to deal precariously with truth and had never been properly trained in the characteristics and use of his off-duty weapon.
The trial court concluded that the sheriff's negligent acts of omission were a cause of the injuries to Roberts.
The court of appeal concluded:
... that the trial court did not commit manifest error in finding that Sheriff Foti's negligence in commissioning defendant Benoit as a deputy sheriff was a cause in fact of the plaintiff's injuries. 574 So.2d at 1263.
This court correctly stated in its original opinion: "More probably than not, this accident would not have happened if Benoit had possessed the basic qualifications of education, experience, intelligence and reliability, and if he had been adequately trained in the safe, responsible use of firearms." Thus, the trial court and the court of appeal did not err in finding the negligent hiring, training and commissioning of Benoit to be a cause in fact of the harm to Roberts.
After finding cause in fact, there is no problem about duty and plaintiff's being within the ambit of protection.
By "legal cause", which the majority finds missing, the question posed is whether plaintiff is among those the law should protect from negligent hiring and commissioning of deputies? It seems to this writer *1062 that any member of the public should be protected from such negligence.
Therefore, I respectfully dissent.
DENNIS, Justice, dissenting.
I respectfully dissent. I am surprised and disappointed that the proposed majority opinion does not address more fully the cause-in-fact question that was so cogently argued by the parties at rehearing; and I am dismayed that my colleagues have now applied an even more cramped view of "duty" in a tort case than did this court's original opinion. This turn for the worse reminds me of Justice Cardozo's observation: "Metaphors in law are to be narrowly watched, for starting out as devices to liberate thought, they end often by enslaving it." Berkey v. Third Ave. Ry., 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926) (Cardozo, J.)

1.
Cause-in-fact is the simplest and most obvious problem connected with legal cause, proximate cause or duty-risk analysis. It is a matter upon which lay opinion is quite as competent as that of the most experienced court. For that reason, in the ordinary case, it is peculiarly a question for the jury or trier of the facts. Prosser and Keeton on Torts § 41.
After reviewing the record, I believe that the plaintiff introduced sufficient proof from which the trial court as the trier of the facts could have found reasonably by a preponderance of the evidence that the multiple negligent acts and omissions of the Sheriff were a cause in fact of the damage to the plaintiff. The Sheriff's acts and omissions, in summary, were: (a) the negligent hiring of Benoit; (b) the negligent training of Benoit; (c) the negligent delegation of the authority of a peace officer to Benoit. These acts and omissions combined to enable Benoit, although incompetent and unskilled as a deputy, to act as a peace officer 24 hours a day, to carry a badge and a gun at all times, and to use deadly force whenever Benoit deemed it to be warranted. There is no evidence that the Sheriff ever told Benoit that he was not a real deputy or peace officer, that he could not carry a real badge or gun, or that he could not really use his gun as a law enforcement officer.
It cannot be said in this case that the cause-in-fact issue is so clear that reasonable persons could not differ. The significant circumstances immediately causing the accident were: Benoit's ownership and possession of the hand gun; his imprudence and want of skill in wielding the firearm; and his consumption of alcohol while handling the weapon. The Sheriff's negligence in cloaking Benoit with the authority of a peace officer encouraged Benoit to purchase the weapon and carry it on his person. Also, the Sheriff's negligence in making a deputy of the unqualified Benoit and in failing to give him proper firearms training contributed to Benoit's unreasonably dangerous conduct that led to the accident. The evidence was clear that Benoit purchased the handgun and a holster shortly after he was commissioned, that Benoit did not habitually carry a weapon before he became a Deputy, and that it was the Sheriff's policy to encourage all deputies to carry weapons during off duty hours. On the other hand, there were some factors that tended to make it less likely that the Sheriff's negligence was a cause in fact of the accident. Many persons who are not police officers frequently carry handguns for their protection. Because Benoit owned another handgun before he became deputized, he might have carried and mishandled a gun as he did on the day in question had he never been authorized to act as a peace officer. Finally, the evidence was equivocal as to whether Benoit regularly carried the handgun in question on his person after he became a Deputy or whether it was in his car trunk or on his person when he first arrived at Roberts' house.
Therefore, it was for the trial judge as trier of the facts to determine whether it was more probable than not that the Sheriff's negligence caused the accident. From my review of the record, I believe the evidence was sufficient to support a reasonable finding of probability that the accident would not have occurred but for the negligent *1063 acts and omissions of the Sheriff. Correlatively, the evidence also sustains a rational conclusion that the Sheriff's negligence was a substantial factor in bringing about the plaintiff's damage. This court has accepted and employed both the "but for" and the "substantial factor" cause in fact rules. Eg., Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962).

2.
The "duty" analysis of the majority's rehearing opinion is an argument based on a false premise. The original opinion correctly recognized that in a negligence case the duty is always the sameto conform to the legal standard of reasonable conduct in light of the apparent risk. Prosser and Keeton on Torts § 53. On the other hand, the rehearing opinion attempts to reduce the Sheriff's duty, to a "duty not to promote a cook to Deputy in name alone, that is, not to engage in ersatz promotions," by assuming that is what happened in this case.
The record, however, contains absolute, uncontradicted proof to the contrary. Benoit was no "ersatz," "titular," or "in name only" deputy sheriff. He was fully commissioned in accordance with the statutory requisitesa signed, sealed, sworn and confirmed deputy sheriff. Furthermore, even if there had been any technical flaw in Benoit's appointment, which does not appear in the record, he would have been at least a de facto deputy because he acted as such under color of right and had the reputation in the community of being a deputy sheriff. Malone v. Howell, 140 Fla. 693, 192 So. 224 (1939); Combs v. McKenzie, 289 Ky. 360, 158 S.W.2d 938 (1942). In sum, Benoit was given a real commission and real badge, was encouraged to carry a real gun, was required to act as a real peace officer when he thought an emergency required. There is no evidence that the Sheriff placed any restrictions on the police power delegated to Benoit. He was a real deputy sheriff.
As the court unanimously recognized on original hearing, the Sheriff unquestionably owed a duty to members of the public to exercise due care in the selection and training of individuals to be delegated the authority to exercise the police powers. Furthermore, a solid majority of this court agreed then that the Sheriff had failed to comply with the standard of conduct required to satisfy that duty. See Prosser & Keeton § 53. We disagreed only on whether the Sheriff's negligence that caused the accident was a legal cause thereof, or, in duty-risk jargon, whether the risk of that type of accident fell within the scope of the duty owed by the Sheriff to persons like Roberts.
On first hearing, I thought the majority committed serious error only in its reasoning and decision of the legal cause issue, as I tried to point out in dissent. This was the error that I thought we had granted a rehearing to correct. But now the court seems determined to commit even greater error with an opinion that implies that the Sheriff owes no duty to protect the citizens from unqualified, poorly trained deputies but owes only an obligation not to cheat the public fisc.
Surely, the present opinion of the court should not be taken at face value. Yet, on the chance that it might be, and as a surfeit of caution, I will attempt to point out the untoward results that may occur if the opinion is accepted literally as precedent.
The sheriff is constitutionally designated as the chief law enforcement officer in the parish. La. Const. art. V § 27. The office of sheriff, one of the oldest offices known to the common law system of jurisprudence, is one of great dignity and greater antiquity. 1 Anderson on Sheriffs, Coronors, Constables § 1 (1941). The sheriff is vested with enormous powers, duties and responsibilities, and a deputy sheriff acts in the place of the sheriff in exercising and discharging them within the community and among the populace. Traditionally the sheriff is the parish's or county's chief executive officer, Fuller v. State, 40 Ala. App. 297, 115 So.2d 110 (1958), an officer of the court, State ex rel. Andrews v. Superior Court of Maricopa County, 39 Ariz. 242, 5 P.2d 192 (1931), and is made responsible as the conservator of the peace within *1064 his jurisdiction. Sweat v. Waldon, 123 Fla. 478, 167 So. 363 (1936). Sheriffs and deputy sheriffs, as peace officers, necessarily exercise police powers and enforce laws enacted for the protection of the lives, persons, property, health and morals of the people. Fields v. State, 160 Fla. 877, 36 So.2d 919 (1948); Elder v. Camp, 193 Ga. 320, 18 S.E.2d 622 (1942). They are under a duty to investigate crimes, to suppress them, and to arrest and prosecute persons who commit them. Maxwell v. Andrew County, 347 Mo. 156, 146 S.W.2d 621 (1940).
If large numbers of unqualified and poorly trained deputies are commissioned, the dangers of accidents such as the plaintiff's injury will be greatly increased. If a sheriff could not be held responsible for his failure to exercise due care in the selection and training of persons to be entrusted with these vital powers, duties and responsibilities, there would be little in tort law to deter the delegation of police powers to convicted felons, practicing addicts and alcoholics, mental patients, and other corrupt or dangerous persons.
The question of legal cause is an issue of mixed fact and law or policy. Prosser & Keeton on Torts § 45 (1984). Like the cause-in-fact problem it is a question for the trier of fact unless the issue is so clear that reasonable persons could not differ. Id. at 321. In this case, the legal cause or duty-risk issue is one upon which reasonable minds clearly can disagree and therefore was properly a question to be decided by the trial judge as the trier of fact after considering all of the evidence. Because the issue of whether the Sheriff's negligent acts and omissions were a legal cause of the accident is one upon which reasonable persons may differ, the court of appeal properly affirmed the trial court's decision as the trier of the facts on this issue. This court should have also.
NOTES
[1] Before trial, the City of New Orleans and the State of Louisiana were dismissed. Also, Southern went bankrupt and the Insurance Guaranty Association assumed the defense on behalf of Southern and the Sheriff's Office.
[2] Judge Plotkin disagreed with the finding of liability based on the direct negligence of the sheriff, but would have found the sheriff vicariously liable under master-servant principles. He considered the amount of damages awarded inadequate.
[3] Plaintiff's writ application seeking an increase in damages was denied. Roberts v. Benoit, 575 So.2d 828 (La.1991). Neither Benoit or Insurance Guaranty Association applied for writs, and the judgment is final and definitive as to those defendants.
[4] Based on the evidence presented, the trial court concluded that Benoit was unquestionably intoxicated at the time of the accident.
[5] The sheriff also urges in the alternative that plaintiff was comparatively negligent and that the amount of damages is excessive. Since we find the sheriff is not liable, it is unnecessary to address those issues.
[6] The term "deputy" as used herein refers to any law enforcement officer and the term "municipal" refers to any governmental employer. Negligent "hiring" refers to hiring, training and retention of employees.
[7] We add, however, that there is substantial evidence supporting the lower courts' findings of breach of duty. Benoit lacked basic qualifications for commissioning as a deputy sheriff and his training was inadequate for that position, even though his regular duties did not encompass the usual full gamut of law enforcement duties.
[1] As noted in our original opinion: "Before trial, the City of New Orleans and the State of Louisiana were dismissed. Also, Southern went bankrupt and the Insurance Guaranty Association assumed the defense on behalf of Southern and the Sheriff's Office."
[2] Based on the evidence presented, the trial court concluded that Benoit was unquestionably intoxicated at the time of the accident.
[3] Art. 2315 provides, in part:

Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
[4] Art. 2316 provides:

Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
[5] Of course, in Louisiana, we are most familiar with legal cause when stated in terms of the scope of the risk, due to the "inherent flexibility [of] the duty-risk methodology." Timothy J. McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227, 1236 (1984).
[6] See, Patrick Kelley, Proximate Cause in Negligence Law: History, Theory, and the Present Darkness, 69 Wash.U.L.Q. 49, 54 (1991), (hereinafter cited as "Kelley") for a comprehensive history of the subject.
[7] More fully stated, Bingham's analysis ran thus: "Why should a defendant be responsible for occurrences entirely extraneous to the purposes of his duty? To hold him responsible would be to exact an arbitrary penalty beyond compensation for his wrong in the form of involuntary insurance." Joseph Bingham, Some Suggestions Concerning "Legal Cause" at Common Law I, 9 Colum.L.Rev. 16, 35 (1909), as cited in Kelley at 85. Bingham concluded his article with this sage advice: "let us not procrusteanize the law of `legal cause' upon a bed of unprincipled generalities, nor imagine that repeating the problem in obscure language tends towards a solution." Joseph Bingham, Some Suggestions Concerning "Legal Cause" at Common Law II, 9 Colum.L.Rev. 136, 154 (1909).
[8] F. Harper, F. James, and O. Gray, The Law of Torts (2d ed. 1986).
[9] One commentator has stated: "[i]t seems evident that the Supreme Court of Louisiana has been trending rather strongly in recent years toward a fairly consistent position that the Louisiana tort law should seek to avoid the proliferation of doctrines of a narrow and rigid thrust, in favor of more straightforward, conscious, and fact-oriented resort to the underlying principles of the Louisiana Civil Code." David W. Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1, 24 (1973).
[10] Below are a few more cases in which the ease of association test was applied:

Weber v. Charity Hospital of Louisiana, 475 So.2d 1047, 1050 (La.1985) (duty imposed on host driver to refrain from causing injury to another by negligent operation of her car encompassed risk that victim's injuries might be worsened by the treatment for those injuries); Vicknair v. Hibernia Bldg. Corp., 479 So.2d 904, 909 (La.1985), (defendants' duty to prevent fire alarm from falsely sounding encompassed risk pregnant woman would experience emotional distress and descend many flights of stairs, causing a premature delivery); Forest v. State, 493 So.2d 563 (La.1986) (state's duty to use warnings encompasses risk an unwary driver might crash through an improperly marked barricade and kill a pedestrian); Sibley v. Gifford Hill and Co., 475 So.2d 315, 319 (La.1985) (LP & L's duty to its customers to prevent surging, because customer's plant or equipment might be damaged by sudden voltage surge, did not reasonably encompass the risk that a grounded person on customer's premises might place a metal object close enough to the transmission line for arcing to occur contemporaneously with the surging, yet far enough away to avoid close proximity arcing.)
[11] See Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), in which a father gave his twelve-year-old a weapon without adequately schooling him in its use. In Watson, the Court assumed a twelve-year-old can be properly trained to use a gun:

Although he had owned a `child's model .22' caliber rifle since the age of ten, and had been allowed to shoot since he was nine, Shane had until then merely hunted small game. He had, however, admired his father's Marlin 30-30 rifle, and the gun was presented to him on his twelfth birthday (just twelve weeks before the ill fated deer hunting trip).... Shane himself testified that he had only twice fired this weapon. Perhaps more significantly, the boy lacked familiarity with the use of the scope attached to the rifle. (Emphasis added)
Id. at 969. It is difficult to square the Court's assumption in Watson that a twelve-year-old, not yet in the eighth grade presumably, may be taught to hunt with sophisticated weapons, with the contention that an adult, because of his educational level and concealed DWI, cannot be imputed with knowledge of the most rudimentary tenets of gun-handling, such as: loaded guns should not be played with, especially by intoxicated people.
[1] Benoit was never issued a gun, required to buy a gun, assigned duties involving the use of a gun or allowed to carry a gun on the job.
[2] Benoit could have purchased the same gun without a commission. The commission merely authorized the carrying of a concealed weapon, which Benoit could not have legally done without the commission. However, the concealing of the weapon (the only advantage available to a person with a commission over an average citizen in this time of virtually unlimited access to purchase of any weapon) had absolutely nothing to do with the accident, and this legal authority to conceal a weapon was certainly not a cause-in-fact of the accident.