11 Chief Judge WILLIAM H. BYRNES III.
This suit was originally filed by Wanda Haydin, individually and as natural tutrix of her minor sons, Jeffrey Haydin and David Haydin claiming damages for physical injury to Jeffrey and for mental anguish to both Jeffrey and David. Ms. Haydin alleged no damages to herself. Named as defendants were Crescent Guardian, Inc., the supplier of security guard services to the defendant, Winn-Dixie Louisiana, Inc., Irvin Skinner a security guard for Winn-Dixie and an employee of Crescent Guardian, Inc., Bruce Hart, the manager of the Winn-Dixie store where the incident that is the subject of this litigation occurred, and the defendants insurers. Winn-Dixie filed a cross claim for indemnity against Crescent Guardian.
This matter arises out of an incident that occurred on June 16, 1995 in the parking lot of the Winn Dixie Supermarket on Bundy Road. The Haydin brothers, Jeffrey, age 16, and David, age 15, were in the parking lot when David broke the window of an unoccupied vehicle belonging to a person alleged to have had a dispute with David. Anthony Fields witnessed this act and immediately ran inside the store and informed the store’s security guard, Irvin Skinner, and the store manager, Bruce Hart. By coincidence, Anthony Fields is the manager of a Winn Dixie store at another location.
| ^According to Mr. Skinner, the security guard, when he found the Haydin brothers in their vehicle, Jeffrey was in the driver’s seat and David was in the passenger seat. The boys refused to exit their vehicle when requested to do so by Skinner.
The trial court found Mr. Fields to be a credible witness. Mr. Fields testified that as the Haydins’ vehicle reversed, it struck a parked car. Mr. Hart tried to stop the vehicle by reaching in through the window and putting the car in park before it began backing up.
The trial court rendered judgment in favor of the plaintiff, Jeffrey Haydin, and against the defendants, Crescent Guardian, Inc., Irvin Skinner, Bruce Hart, and Winn-Dixie Louisiana, Inc., in the sum of *1036 $172,394.00, plus interest and costs. In his reasons for judgment the trial court broke this figure down into two components: $42,394.00 for Jeffrey’s medical expenses and $130,000.00 for general damages. In a footnote to his reasons for judgment the trial court noted that Crescent Guardian and Mr. Skinner settled with Jeffrey for $150,000.00 and, in effect, limited their total exposure (including any judgment, cost, interest, etc.) in this case to $150,000.00. The trial court judgment assigned 50% of the fault to Crescent Guardian and Mr. Skinner, 40% to Jeffrey and his brother, and 10% to Bruce Hart and Winn-Dixie. Winn-Dixie’s cross-claim against Crescent Guardian was denied.
Crescent Guardian, Inc., Skinner, and Scottsdale Insurance Company appealed devolutively as the assignees of the rights of Jeffrey Haydin and may hereinafter be referred to from time to time as the “Hay-din assignees.” Bruce Hart and Winn-Dixie filed a suspensive appeal.
| ¡Winn-Dixie and Bruce Hart assign no error to the trial court’s calculation of general damages. Instead, they assign as error the following findings by the trial court: That the actions of Bruce Hart were negligent and a cause in fact of Jeffrey’s injuries; that Bruce Hart did not act as a reasonably prudent man would have acted under the circumstances; and the failure of the trial court to find that Jeffrey Haydin was precluded from recovering damages because of his own illegal act.
The Haydin assignees assert that the trial court’s assessment of Jeffrey’s general damages was erroneously low; that it was error to find that Mr. Skinner was negligent and a cause in fact of Jeffrey’s injuries; and that it was error to assign only 10% fault to the actions of Hart.
None of the appellants assigns any error to the calculation of medical expenses.
Mr. Fields was the only witness that the trial specifically described as credible. Mr. Fields testified that he saw the Hay-din brothers at Todd Taylor’s car [1] David was on the side breaking the glass and Jeffrey stood in front as though on lookout. It was Jeffrey’s furtive glances that initially made Mr. Fields suspicious and attracted his attention.
In his reasons for judgment the trial court noted that:
Importantly, Fields testified that Hart reached in the vehicle and attempted to stop the Haydin Boys from leaving before[2] the Haydin vehicle began backing up.
Mr. Fields’ testimony in this regard was as follows:
Q. Tell me what you observed.
14A. The security guard was standing outside the car like he was trying to get them to get out of the car, and that’s when Mr. Hart was arriving to the car, and that’s when he tried to take off and back up.
Q. Had the car moved before Mr. Hart got to there?
A. No.
Q. What did Mr. Hart do as he got to the car?
A. Mr. Hart was approaching the car. That’s when he must have started it up and was getting ready to take off, and as he was taking off[3] Mr. Hart looked like he tried to get the *1037 keys or something our of the car to get them to stop.[4] I am not sure what was going on inside the car.
Q. But you are sure that as Mr. Hart approached the vehicle the boys attempted to leave and Mr. Hart put himself into the vehicle to try to turn it off or stop them?
A. Put his arm inside the vehicle like he was either [trying] to take the key off — I don’t know what he was trying to do, but that is what it looked like.
On cross-examination Mr. Fields testified that:
Q. Now, at the time Mr. Hart placed his hands into the vehicle, the vehicle was moving; correct?
A. It started moving; yes, at this time, that’s when he placed his hand in.
Mr. Fields testified that when he saw Mr. Skinner conversing with the Haydins that it was not a dangerous situation. He went on to testify that the situation only became dangerous once Mr. Hart reached into the car and the boys attempted to flee. Mr. Fields described the situation as follows:
Q. The security guard was still standing where he was before?
|sA. Yes, sir.
Q. He was not inside the vehicle?
A. No.
Q. What did you see after that?
A. After that, that is when the car— they had done got the car in reverse. It was going back and Mr. Hart was still trying to get whatever he was trying to do inside the car, and that’s when the security guard took his gun and he fired a shot at them.
Mr. Skinner testified that when he approached the Haydins’ vehicle the boys seemed to be having trouble getting it started. He testified that he stayed five to seven feet away from the vehicle because he had been trained that when you enter a certain zone it makes the person you are confronting defensive. He tried to talk to both of the young men. He did not accuse them of breaking the car window because he felt that he had no proof that they had done so. He said that he felt that he had the situation under control until Mr. Hart arrived rapidly on the scene where he promptly “tried to jump into the vehicle.” He testified that the vehicle was stationary at the time Mr. Hart tried to jump into it. He also testified that he thought that he recalled stating in his deposition that the car was backing up. A struggle between Mr. Hart and one of the young men ensued. Mr. Skinner testified that he tried to pull Mr. Hart away.
It was Mr. Skinner’s opinion that the proper thing to have done was to let the young men leave peacefully, take down the number of their license plate and turn the matter over to the proper authorities later. He felt that Mr. Hart’s intervention prevented this peaceful resolution of the matter. He denied going up to the car and | fisticking a gun in Jeffrey Haydin’s neck. This was confirmed by Mr. Fields’ credible testimony quoted previously.
Mr. Skinner was absolutely positive that he saw one of the boys pass a .38 revolver to the other boy. It was only when he saw the boy’s gun that he pulled his gun and fired in fear of his life and the lives of others in the parking lot including Mr. Hart. His original intention had been to try to keep the boys engaged in conversation until the police arrived. If the boys did not have a gun then Mr. Skinner’s actions were not reasonable. If the boys *1038 did have a gun then his actions were reasonable.
Jeffrey Haydin, the plaintiff, testified that when he and his brother, David, pulled into the Winn-Dixie parking lot, David asked to be let out of the car without explaining why. He let David out of the car and continued in the lot until he found a parking space. He listened to the end of a song by which time David returned to the car. He did not see what David did while he was out of the car. This testimony was contradicted by the credible testimony of Mr. Fields, supra, indicating that Jeffrey was standing lookout by the car while David broke the window. Implicit in the trial court’s finding that Mr. Fields’ testimony was credible, is a finding that most aspects of the Haydin brothers self-serving testimony was not credible. Even in the absence of the trial court credibility call favoring Mr. Fields, which call this Court must respect under the manifest error standard of review, we would find that most of the Haydin brothers’ testimony is hard to believe. When David returned to the car he told Jeffrey, “Let’s go.” When Jeffrey asked David why, his only response was, “Come on, let’s go.” When he asked him again he still gave no reason. Jeffrey testified that, “I figured something may have happened, but at this time, I didn’t know what exactly happened.” Jeffrey then testified that:
|7I sat up in the car. When I was about to put the car in reverse, someone ran up to me and put something on my neck and told me to get out of the car, and when I stopped, I thought it was a joke at first, I didn’t know what happened because I knew a few people that worked at the store.... I froze for a second and someone yelled again, “Get the fuck out of the car.”
When I complied I was like, “Okay, all right.” Just, “Okay.” I was trying to calm down. It was no more than a second. I was trying to put the car in park, and I was sitting up. Somebody else ran up to the car and reached toward the column. When I leaned back to the passenger side, because there was two people like almost leaning into the window, and when I was leaning back, I was just Like, “Okay, calm down, calm down.” I believe it was Mr. Hart backed up and then the security guard backed up.
When I began to sit back up to put the car in park, I was putting the car in park, and then he said, “Get the f... out of the car, you white bitch,” and then I am like, “All right, chill, chill, chill.” I told my brother, Daivd, to get out of the car when he was in the process he was — I didn’t really look, I was trying to stay calm. He tried to open the door. When he was — I don’t know if he was opening the door or not, I don’t know. I tried to put my hands in again, and then somebody said, “you take me for a fucking joke,” and I heard a pop, and all I saw was blood. My arm was like just swollen and bleeding, and I saw Mr. Hart begin to back away, and then I backed up and I backed up to leave, and I hit another car.
From there, Jeffrey drove directly to Methodist Hospital for treatment for gun shot wounds to his arm and stomach. He believed that one bullet may have gone through his arm into his stomach.
On cross-examination Jeffrey testified that when he parked the car and was listening to the song he left the car in gear with his foot on the break in spite of the fact that he testified that it was his intention to go into the store when his brother, David, returned to the car. He denied exiting the car and standing watch for his [¡¡brother. Thus, the car was still in gear when someone came up and stuck what he *1039 assumed to be a gun in his neck. He testified that when this happened he told his brother to get out of the car, but his brother just sat there in the passenger seat. His brother didn’t lean over and he didn’t pass him anything.
Jeffrey testified that he didn’t get out of the car because he “was waiting for the man to back up so I could open the door and proceed to exit the vehicle.” He testified that about three seconds later the man shot him for no reason even though he had his hands in the air. He said that he didn’t see Mr. Hart until he started backing up after he had been shot. Then his testimony became somewhat confused about when he placed the car in park and when Mr. Hart approached and what happened when he did so. He testified that the vehicle was in park when Mr. Hart put his hand in the vehicle. He did not put his car into reverse until after he was shot.
Jeffrey testified that he saw a person reach into the car who he later learned was Mr. Hart. Mr. Hart immediately removed his hand. That was the only time he put his hand in the car. He put the car in park and heard a gun shot. He saw Mr. Hart backing away. He then put the car in reverse. He testified that Mr. Hart did nothing that would have made him pull a gun. He also testified that he did not own a gun.
David Haydin testified that when he asked his brother to let him out of the car in the parking lot he didn’t tell him what he intended to do to Todd Taylor’s car because he was afraid that Jeffrey would try to stop him. He testified that when he got back into the car with his brother, the security guard came up with his gun drawn. Then the store manger ran up. Both were inserting themselves into the car. 19There was no gun in the car. “Next thing I know, that’s when Mr. Skinner put the gun right on Jeffrey’s arm and shot.”
Jeffrey and David’s testimony was basically self-serving and unbelievable. For example, if it had been truly their intention to go into the store there is no reasonable explanation for Jeffrey leaving the car in gear after parking and there is no reasonable explanation for David getting back in the parked car after breaking the window of Todd Taylor’s car.
When Mr. Hart testified he said that he did not see a gun and no gun was ever found. The trial court noted that had there been a gun, Mr. Hart was in the best position to have seen it.
Mr. Hart also testified that his hand was in the car perhaps three or four times. He testified that when he first approached the scene, Mr. Skinner was talking to Jeffrey and the situation was not hostile. He said that he was forced to grab into the car to keep from being knocked over by the vehicle as it sped backwards. The vehicle stopped. When the vehicle backed again and hit another car he decided to reach in and attempt to put the vehicle in park.
He testified that he had a feeling the security guard was going to shoot so he shouted, “Don’t do it, don’t do it.” Then he heard a shot and told the security guard, “What the hell you were doing? [sic]” and, “This is ridiculous.” Then the car started going backwards and there was another shot.
Roberts v. Benoit, 605 So.2d 1032 (La.1991) is perhaps the lead Supreme Court case setting forth negligence criteria and the “ease of association” theory:
The standard negligence analysis we employ in determining whether to impose liability under Civil Code Article 2315 is the duty-risk analysis, which consists of the following four-prong inquiry:
*1040 |inI. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-faet of the harm which occurred?
II. Did the defendant owe a duty to the plaintiff?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?
[Citations omitted.] For a plaintiff to recover on a negligence theory, all four inquiries must be affirmatively answered.
Id., at p. 1041-1042.
Once a duty and a breach thereof have been established, the court must then determine if the breach is a legal cause of the victim’s injuries. The Roberts [v. Benoit, 605 So.2d 1032 (La.1991) ] court analyzed legal cause in terms of ‘proximate cause’ and ‘cause in fact’, and concluded that Louisiana has merged the two into an ‘ease of association’ test. Roberts, supra at 1045, 1055. Although not based entirely on foreseeability, the test does encompass that factor. Essentially, the inquiry is ‘How easily does one associate the plaintiffs complained of harm with the defendant’s conduct?’
Carr v. City of New Orleans, 626 So.2d 374, 380 (La.App. 4 Cir.1993).
See also the following Supreme Court discussion of the “ease of association” test in Roberts, supra:
In determining the limitation to be placed on liability for a defendant’s substandard conduct — i.e., whether there is a duty-risk relationship — we have found the proper inquiry to be how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced. Hill [v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972)1 supra. Restated, the ease of association inquiry is simply: “How easily does one associate the plaintiffs complained-of -harm with the defendant’s conduct? ... Although ease of association encompasses the idea of foreseeability, it is not based on foreseeability alone.” Crowe, supra at 907. Absent an ease of association between the duty breached and the damages sustained, we have found legal fault lacking. Hill, supra; Sibley v. Gifford Hill and Co., Inc., 475 So.2d 315, 319 (La.1985); See also Williams v. Southfield School, Inc., 494 So.2d 1339, 1342 (La.App. 2d Cir.1986).
Id. at p. 1045.
Cause in fact is usually a but for test. Quick v. Murphy Oil Company, 93-2267 (La.App. 4 Cir. 9/20/94); 643 So.2d 1291, 1295. If the plaintiff probably would not have sustained the injuries but for the defendant’s substandard conduct, such conduct is a cause in fact. Roberts, supra, 605 So.2d at 1042. The substantial factor inquiry is an alternative method of analysis used when two or more combined causes are present. Quick, 643 So.2d at 1295.
Duty is a question of law. The question of whether a duty exists in a particular set of circumstances is a question of law for the court to decide. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94) 646 So.2d 318, 322. Simply put, the inquiry is whether the plaintiff has any law — statutory, jurisprudential or arising from general principles of fault — to support his claim. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993).
The essence of the legal cause inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the duty. Roberts., 605 So.2d at p. 1044.
There is no “rule” for determining the scope of the duty. Regardless if stated *1041 in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the duty. Edwards v. State, 556 So.2d 644, 648-49 (La.App. 2d Cir.1990). In making this policy determination, this court has previously quoted the following language from Malone, Ruminations on Cause-In-Fact, 9 Stan. L.Rev. 60, 73 (1956), which is worthy of repetition.
All rules of conduct, irrespective of whether they are the product of a legislature or are a impart of the fabric of the court-made law of negligence, exist for purposes. They are designed to protect some persons under some circumstances against some risks. Seldom does a rule protect every victim against every risk that may befall him, merely because it is shown that the violation of the rule played a part in producing the injury. The task of defining the proper reach or thrust of a rule in its policy aspects is one that must be undertaken by the court in each case as it arises. How appropriate is the rule to the facts of this controversy? This is a question that the court cannot escape.
Gresham v. Davenport, 537 So.2d 1144, 1147 (La.1989) (quoting Malone, supra) (emphasis in original). In short, the scope of protection inquiry asks “whether the enunciated rule or principle of law extends to or is intended to protect this plaintiff from this type of harm arising in this manner.” Crowe, supra at 906 (emphasis in original).
Generally, the scope of protection inquiry becomes significant in “fact-sensitive” cases in which a limitation of the “but for” consequences of the defendant’s substandard conduct is warranted. Fowler, 556 So.2d at 6. These cases require logic, reasoning and policy decisions be employed to determine whether liability should be imposed under the particular factual circumstances presented.
Id., at p. 1044-1045.
This Court finds that the reasoning of the trial court in finding that Mr. Hart’s actions were among the causes in fact of plaintiffs damages suffers from the same flaw found by the Supreme Court to have caused the court of appeal to err in Roberts, 605 So.2d at 1044:
As noted, a fundamental flaw in the [ (duty and cause in fact) ] court of appeal’s analysis is that it stops at this point, leaving the more difficult legal causation questions unanswered; as the dissent aptly observed, “[t]he legal causation issue is not directly addressed.” [Roberts v. Benoit] 574 So.2d [1256] at 1264 [ (La.App. 4th Cir.1991) ]. This flaw illustrates a common confusion, |iawhich we discussed in Fowler v. Roberts, 556 So.2d 1, 6 (La.1989), between the duty inquiry and the scope of protection (or scope of liability) inquiry. While the former questions the existence of a duty, the latter assumes a duty exists and questions whether the injury the plaintiff suffered is one of the risks encompassed by the rule of law that imposed the duty. Id. As our resolution of the scope of protection issue below is dispositive of this case, we pre-termit the breach of duty analysis that is usually done at this point. [Footnote seven omitted.]
This court finds that Mr. Hart’s actions are not the legal cause of Jeffrey’s injuries. Either the Haydin boys had a gun or they did not. If they had a gun, it was the sight of the gun that caused Mr. Skinner to shoot Jeffrey. It would not be Mr. Hart’s fault that the boys had a gun which they later denied having. Mr. Hart did *1042 not ask Mr. Skinner to shoot. There is no ease of association between his presence on the scene and the shooting. If Mr. Hart did owe a duty to Jeffrey not to act as he did, the scope of that duty did not extend to a fact situation in which the boys pull a gun and Mr. Skinner shoots Jeffrey.
On the other hand, if there was no gun (the boys said there was no gun, the trial court implicitly found that there was no gun, no gun was ever found, and no one, including Mr. Hart, saw a gun with the exception of Mr. Skinner) then there was no reason for the shooting and Mr. Hart cannot be said to be at fault in the matter. There is no ease of association between Mr. Hart’s actions and an unprovoked shooting. If Mr. Hart could be said to owe a duty to Jeffrey not to act as he did, the scope of that duty did not extend to a fact situation in which Mr. Skinner pulls his gun and shoots Jeffrey without provocation. There was no indication that there was a potential for gunplay when Mr. Hart came on the scene. Therefore, this Court finds that it was error for the trial court to assess any fault to Mr. Hart and Winn-Dixie.
|14As we have found no fault on the part of Mr. Hart and Winn-Dixie we reverse that portion of the trial court judgment assigning fault to them and holding them liable for damages to Jeffrey. Because Jeffrey has settled all other claims it is not necessary for this Court to reallocate the 10% damages assigned by the trial court to Mr. Hart and Winn-Dixie.

REVERSED IN PART AND RENDERED.

.Mr. Fields did not know the Haydins' identity at the time, nor did he know the owner of the vehicle.

. Emphasis original.

. Emphasis added.

. Emphasis added.